# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDOLF CHEREWICK, an individual,<br><br>Plaintiff,<br><br>v.<br><br>STATE FARM FIRE AND CASUALTY, an Illinois Corporation; and, DOES 1-50,<br><br>Defendant. | Case No.:  3:20-cv-00693-BEN-MSB<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;**<br><br>**(2) OVERRULING BOTH PARTIES' EVIDENTIARY OBJECTIONS; and**<br><br>**(3) GRANTING DEFENDANT'S REQUEST FOR JUDICIAL NOTICE**<br><br>**[ECF Nos. 23, 24, 25, 26]** |

## I.   INTRODUCTION

Plaintiff RANDOLF CHEREWICK ("Plaintiff") brings this action against Defendant STATE FARM FIRE AND CASUALTY, an Illinois corporation ("Defendant") for its alleged bad faith refusal to provide benefits which Plaintiff alleges were due and owing to him under his Boatowners Policy.  *See* Complaint, ECF No. 1-2 ("Compl.") at 2.

Before the Court is Defendant's Motion for Summary Judgment (the "Motion"). ECF No. 23.  The Motion was submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF

No. 27.  After considering the papers submitted, supporting documentation, and applicable law, the Court **GRANTS** Defendant's Motion because no genuine issue of material fact exists as to whether there was coverage for Plaintiff's boat, meaning Defendant is entitled to summary judgment in its favor as to all of Plaintiff's claims.   The Court also **OVERRULES** both parties' evidentiary objections but **GRANTS** Defendant's Request for Judicial Notice.

## II.    BACKGROUND

This case arises from two claims submitted by a boat owner to his insurance carrier. The principal controversy is bound up in the first claim which raises an issue of first impression: Does a boatowners insurance policy cover an accident arising during a sea trial—which is essentially the maritime equivalent of a car mechanic's test drive, or does it fall under the repair exclusion as part of the repair process?  This Court finds that damage arising during a sea trial is excluded under a repair exclusion.

### A.    Statement of Facts[1]

In 2008, Plaintiff purchased a new 27-foot Boston Whaler, which was named the "Artemis" (the "Vessel").  Compl. at 5, ¶ 10; Mot. at 9:3-4; Oppo. at 10:9-11 (citing Declaration of Randolf Cherewick, ¶ 4).

#### 1.    *Plaintiff's Boatowners Policy*

Defendant issued a Boatowners Policy Number 47-BJ-R419-1 to Plaintiff for the period December 31, 2014 through December 31, 2015 (the "Policy").  Mot. at 7:5-7, 17:5-6; Exhibit 1 to Complaint, Renewal Certificate, ECF No. 1-2 at 19; Oppo. at 16:16-18.  The Policy was renewed for the policy period from December 31, 2015 through December 31,

---

[1]     The majority of the facts set forth are taken from the operative complaint, *see* Compl., or the facts provided in Plaintiff's Motion, Motion, ECF No. 23-1 ("Mot."), which Plaintiff did not dispute in his opposition, *see* Plaintiff's Opposition to Mot., ECF No. 24 ("Oppo.").  For purposes of ruling on Plaintiff's motion for summary judgment, the Court liberally construes all allegations in favor of the non-moving party.  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019), *cert. denied sub nom. Browder v. Nehad*, 141 S. Ct. 235 (2020) (noting that courts review "the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor").

2016.  Mot. at 17:6-8 (citing ECF No. 1-2 at 19-45); Oppo. at 16:16-18; *see also* Compl. at 7, ¶ 20 (pleading that Defendant issued the Policy to Plaintiff on December 31, 2015 and attaching and incorporating the Policy by reference).

The Policy[2] states that it "cover[s] the boats, motors, boat trailers, and boat equipment described in the Declarations."  *See* Policy at 35.  It insures "accidental direct physical loss to the property described in Coverage A, ***except as provided in* SECTION I—LOSS NOT INSURED**."  Compl. at 8, ¶ 26.  Section I of the Policy, covering "LOSSES NOT INSURED," sets forth the applicable exclusions from coverage under the Policy.  Policy at 36-37.  It states that Defendant will "not insure for loss to the property . . . either consisting of, or directly and immediately caused by," *inter alia*," (1) "wear, tear, marring, scratching, denting, deterioration, inherent vice, latent defect, mechanical breakdown, corrosion, electrolysis," or (2) "repairing, renovating, servicing, or maintenance."  *Id*.; *see also* Compl. at 9, ¶ 28 (acknowledging that losses caused by "repairing, renovating, servicing or maintenance" are not covered).

Paragraph 2 of Section I of the Policy also states that it does not cover "any loss which would not have occurred in the absence of . . . . neglect of the insured to use all reasonable means to save and preserve property at and after the time of loss, or when property is endangered."  Policy at 36-37.  It elaborates that a loss arising from the insured's neglect will not be covered "regardless of: (a) the cause of the excluded event; (b) other causes of loss; or (c) whether other causes acted concurrently or in any sequence with the

---

[2]     The Court was provided with three different copies of the Policy.  First, Plaintiff attached a copy of the policy as Exhibit 1 to his Complaint.  *See* Exhibit 1 to Compl., ECF No. 1-2 at 18-86 (the "Policy").  Second, Defendant attached a certified copy of the Policy as Exhibit 7 to the Declaration of Doug Overstreet in Support of Defendant's Motion ("Overstreet Decl.").  *See* Exhibit 7 to Overstreet Decl., ECF No. 23-13 at 2-29.  Finally, Plaintiff attached the Policy as Exhibit 10 to his Declaration.  *See* Exhibit 10 to the Declaration of Randolf Cherewick, ECF No. 24-3 at 1-15 ("Cherewick Decl."), at 105-131.  For ease of reference, all references to the Policy will be to the Policy attached to Plaintiff's Complaint at ECF No. 1-2 at pages 18 through 86; however, all versions of the Policy contain the same terms and exclusions.

excluded even to produce the loss." *Id.*  The Policy also states that it will not "insure for loss described in paragraphs 1. and 2. immediately above regardless of whether" the loss is caused by (a) "conduct, act, failure to act, or decision of any person . . . whether intentional, wrongful, negligent, or without fault" or (b) a "defect, weakness, inadequacy, fault or unsoundness in: (1) design, specifications, workmanship, construction; (2) "materials used in construction or repair; or (3) maintenance; of any property," which "directly or indirectly cause[s], contribute[s] to or aggravate[s] the loss," or "occur[s] before, at the same time, or after the loss or any other cause of the loss."  Policy at 36-37.

"Section I—CONDITIONS" sets out the insured's "Duties After Loss," by providing that "[a]fter a loss to which this insurance may apply, [the insured] shall see that" he or she (1) give[s] immediate notice to [the carrier] or [its] agent" and (2) "protect[s] the property from further damage or loss, make reasonable and necessary repairs required to protect the property, and keep an accurate record of repair expenditures."  Policy at 37. Finally, the Policy states that "[n]o action shall be brought unless there has been compliance with the policy provisions." *Id.* at 38.  It also requires such an "action [to be] started within one year after the date of loss or damage." *Id.*

### 2.   *The Vessel is Brought in for Repair*

From the time Plaintiff purchased the Vessel through June 2015, the Vessel had not been involved in any accidents and was in good condition.  Oppo. at 10:12-23.  Shortly before July 2015, however, the Vessel's engine began overheating. *Id.* at 10:12-16.  In early July 2015, Plaintiff took the Vessel to Oceanside Marine Center ("OMC") and Butch Hainsworth ("Mr. Hainsworth") for inspection and repair of three Honda outboard engines. Mot. at 9:4-5; Oppo. at 7:10-12, 10:19-21; Reply at 6:4-7; Compl. at 5, ¶ 11.  At the time Plaintiff brought the Vessel to OMC, the engines were overheating; one engine ran poorly; one engine would not start; and its two main engines, the auxiliary engine and the generator were plugged up with salt water.  Mot. at 9:6-9 (citing Declaration of GailAnn Y. Stargardter in Support of Motion, ECF No. 23-2 ("Stargardter Decl.") at 1-2, ¶ 2; Exhibit 1 to Stargardter Decl., March 9, 2021 Deposition of Harold L. "Butch" Hainsworth, ECF

No. 23-3 ("Hainsworth Dep.") at 7-9, 20:23-25; 21:24-25; 22:1-8; 19, 72:8-14); Compl. at 5, ¶ 11.  Plaintiff appointed Sean Keating, who Plaintiff believed to be a yacht broker, as his agent in fact to handle the repairs to the Vessel due to Plaintiff's busy schedule.  Mot. at 9:9-13; Oppo. at 12:1-3.  Accordingly, Plaintiff executed a power of attorney in favor of Mr. Keating, so OMC could relay information to Mr. Keating relative to the Vessel.  Oppo. at 12:3-6 (citing Declaration of Randolf Cherewick, ECF No. 24-3 at 1-15 ("Cherewick Decl.") ¶ 13).  While OMC was repairing the Vessel, Plaintiff also agreed with OMC's recommendations for additional work on the Vessel, which included but was not limited to repairing the Vessel's Kohler generator.  Oppo. at 10:28-11:3.  Plaintiff prepaid $17,000.00 for this work.  *Id.* at 11:3-5; Compl. at 5, ¶ 13.

### 3.   *The Vessel is Damaged in an Allision During the Sea Trial*

On November 18, 2015, after some repairs were made, the Vessel entered the water for a sea trial.  Mot. at 7:14-16, 9:14-16; Oppo. at 11:9-12; Compl. at 5, ¶ 14.  According to Mr. Hainsworth, the reason for the sea trial was to "test[ ] the repairs that had been made to the [V]essel" and determine whether "any additional repairs need[ed] to be made to the [V]essel."  Mot. at 9:16-18 (citing Hainsworth Dep. at 10-11, 29:16-30:1-7; 15, 36:9-17; 22, 82:13-18).  As the Vessel was traveling approximately three to five miles per hour and being docked after the sea trial, the electronic controls malfunctioned, causing the port side bow of the Vessel to allide[3] with a concrete piling that holds the dock in place, causing a 12" x 3" gouge that was one inch deep.  Mot. at 7:15-18, 9:19-24 (citing Hainsworth Dep. at 12, 32:2-18; 13, 33:8-24; 20, 74:12-25; 21, 75:1-7).  While OMC was moving the Vessel out of the water into the Travelift[4] to take it to the yard to repair the damage from the allision, it further damaged the Vessel when the port aft side of the bow got caught on a protruding screw, resulting in a three to four-foot-long scratch in the gel coat, approximately $1/16$ inch deep at the water line.  Mot. at 9:25-10:2 (citing Hainsworth Dep.

---

[3]     Defendant states that "[i]n nautical terms, the word allision means the act of striking a fixed object" and refers to "when two moving vessels strike each other."  Mot. at 7:28.
[4]     A Travelift is a machine that lifts boats out of the water.  Mot. at 9:28.

1  at 14, 34:5-17; 16, 41:10-25).

2  ## 4.   *Plaintiff Receives Notice of the Allision*

3  On November 18, 2015, Mr. Hainsworth of OMC e-mailed Plaintiff to inform him

4  that (1) the shift cable on the port side needed replacement; (2) the starboard side had an

5  electronic issue; and (3) during the last sea trial, "while coming into dock, with stbd in

6  forward gear (no throttle) the amber display lights on controls started flashing, then throttle

7  increased on its own," causing them to "bump[ ] the dock which cause[d] minor damage."

8  Mot. at 7:18-21, 10:3-7; *see also* ECF No. 23-3 at 25; Oppo. at 7:14-17, 11:9-12; Reply at

9  6:5-7; Compl. at 5, ¶ 14; *see also* Exhibit 2 to Exhibit 2 to Stargardter Decl., ECF No. 23-

10  3 at 25 (attaching the November 18, 2015 e-mail from Mr. Hainsworth to Plaintiff);.

11  However, he said that OMC would "be taking care of the minor repairs at our cost."  Mot.

12  at 10:5-6; Oppo. at 11:9-12; ECF No. 23-3 at 25.  Mr. Hainsworth also left a voicemail for

13  Plaintiff regarding the damage to the Vessel.  Oppo. at 11:9-12.

14  In early 2016, Mr. Keating went to visit and inspect the Vessel.  Oppo. at 12:13-15.

15  On February 23, 2016, Keating sent Plaintiff and Mr. Hainsworth an e-mail advising that

16  (1) the allision "caused fairly significant damage"; (2) the repairs were imperfect; and (3)

17  "[f]or safety['s] sake," a report on how the damage occurred and the nature and extent of

18  the damage should be prepared.  ECF No. 1-3 at 99; Reply at 6:6-9.

19  On February 29, 2016, Mr. Keating sent Plaintiff an e-mail stating that Mr.

20  Hainsworth "told [Plaintiff] that there was a 'minor scratch,' [but] that was a lie."  Mot. at

21  10:13-16; *see also* Exhibit 2 to Stargardter Decl., ECF No. 23-4 at 10; *see also* Exhibit 3

22  to Stargardter Decl., ECF No. 23-5 at 5 (admitting that he received the e-mail in response

23  to Defendant's Request for Admission No. 6); Oppo. at 9:2-4.  Mr. Keating informed

24  Plaintiff that "the boat hit the city owned marina piling at an apparent significant speed,"

25  which could have cracked the hull,[5] and as a result, should have resulted in a police report

26  _____

27  [5]     The hull of a boat is generally understood to mean the "body of a ship."  *Catlin at*

28  *Lloyd's v. San Juan Towing & Marine*, 778 F.3d 69, 78-79 n.11 (1st Cir. 2015) (quoting

being filed.  Stargardter Decl., ECF No. 23-4 at 10.

In March 2016, Plaintiff asked to go on a sea trial of the Vessel.  Oppo. at 13:9.  On March 16, 2016, Plaintiff boarded the Vessel with Daniel from OMC for a sea trial.  Mot. at 10:24-25 (citing ECF No. 1-3 at 100-101); Oppo. at 13:10-11.  After that sea trial concluded, Plaintiff e-mailed Mr. Hainsworth informing him that Daniel had shown him an area of damage at the bow of the boat that was 12" wide by 3" deep and that he saw that the portion of the boat where the repairs were made had a slightly raised surface.   Mot. at 10:25-28 (citing ECF No. 1-3 at 100-101).  The email also noted problems with the repairs being performed by OMC.  *Id.* (citing ECF No. 1-3 at 100-101); Oppo. at 13:11-17 (citing Cherewick Decl. at 5, ¶ 20).  Plaintiff states that while he was on the sea trial that day, he does not remember seeing the mismatched colors, spider cracking, or raised fiberglass stamping later referenced in his December 4, 2018 letter to OMC.  Oppo. at 13:18-25 (citing Cherewick Decl. ¶ 21).

### 5.   *Plaintiff Moves the Vessel*

At some time after the March 16, 2016 sea trial, Mr. Hainsworth asked Plaintiff to come to OMC so Mr. Hainsworth could show him that the Kholer Generator that OMC had rebuilt operated properly.  Oppo. at 14:5-8.  Instead, Mr. Keating attended the meeting and advised that upon doing so, it appeared that OMC had installed the generator improperly.  *Id.* at 14:8-10.  Daniel also attended this meeting and could not get the generator to start.  *Id.* at 14:10-11.

Later in March 2016, after this visit, OMC asked Plaintiff to remove the Vessel from OMC.  Mot. at 11:1-3; Exhibit 4 to Mot., Plaintiff's March 3, 2021 Deposition, ECF No. 23-6 ("Plaintiff Dep.") at 13-14, 53:23-54:6; Oppo. at 13:11-13.  At the time he removed the Vessel from OMC, the Vessel had not been repaired to his satisfaction.  Mot. at 11:3-5 (citing Plaintiff Dep. at 14, 54:19-22).

In or about June 2016, Plaintiff had S&R Towing, Inc. ("S&R") tow the Vessel from

Eric Sullivan, *The Marine Encyclopaedic Dictionary* 209 (5th ed. 1996) (defining a hull as the "[s]hell or body of a ship")).

OMC and park it on its trailer at 1060 Airport Road, Oceanside, California 92058, in dry storage.  Mot. at 12:3-4 (citing ECF No. 1-2 at 48); Compl. at 6, ¶ 16; Oppo. at 14:13-15 (citing Cherewick Decl. at 6, ¶ 23).

### 6.   *Plaintiff Inspects the Vessel*

In September 2018, as Plaintiff was cleaning the Vessel, he inspected it for the first time on its trailer in secured dry storage at S&R in Oceanside, California.  Mot. at 12:3-7 (citing ECF No. 1-2 at 48); Oppo. at 8:1-6, 15:3-5.  Plaintiff reported that he noticed (1) "a swath of mis-matched color paint on the upper part of the Forward Bow of Boat's hull and poorly fitted fiberglass stamping deck repairs just above the Forward Bow of the Boat's hull" and (2) "'spider' cracking of the Boat's hull and damage to the heavy-duty rubber side boarding strakes (evident there and on the port side near the removable boarding door.)."  Mot. at 12:7-13 (citing ECF No. 1-2 at 48); Oppo. 15:3-9; *see also* Compl. at 7, ¶ 19.  Plaintiff claims that "[t]his damage was not on the Vessel when it was delivered to OMC in 2015."  Compl. at 7, ¶ 19; Oppo. at 8:1-7.  Defendant argues that "he was aware of most of this damage in February and March of 2016."  Mot. at 12:13 (citing, *inter alia*, ECF No. 1-3 at 99-100).

### 7.   *Plaintiff Reports the Claim to His Insurer*

On Saturday, October 6, 2018, almost three years after he had first been notified that the Vessel had been damaged in the allision, Plaintiff telephonically tendered a claim for the damage to the Vessel caused by the November 18, 2015 allision to State Farm.  Mot. at 8:3-4, 11:7-9 (citing Overstreet Decl., ¶ 4, and Ex. 6, SF-CF-000); Oppo. at 8:10, 16:27-17:12; Compl. at 7, ¶ 21.  During this phone call, Andrea Wills, State Farm Fire and Casualty Claim Specialist ("Ms. Wills") asked Plaintiff to provide a summary of the known history leading up to the claim.  Compl. at 7, ¶ 21.  Accordingly, the following day, Sunday, October 7, 2018, Plaintiff provided a written statement of loss.  Mot. at 11:9-11 (citing Overstreet Decl., ¶6, and Doc. 1-2 at Page ID 53-55); Compl. at 7-8, ¶¶ 21-22.  His report of the loss detailed the damage as follows:

> In the month of February of 2016[6], while in care of OMC at 1550 Harbor Drive North, Oceanside, CA 92054, the Vessel … suffered significant and possibly irreparable damages while being operated by the OMC.  It is believed that the Vessel was under command and operation of Butch Hainsworth, General Manager, OMC when the Incident ("crash") took place.  It is believed that the damage resulted from a Sea-trial attempt, while being piloted by Butch Hainsworth, General Manager, OMC, on the Pacific Ocean, in or near Oceanside Harbor (1540 N. Harbor Dr., Oceanside, California).

Mot. at 11:11-19 (citing ECF No. 1-2 at 47); Compl. at 7-8, ¶¶ 21-22; Oppo. at 16:27-17:12.  This report also confirmed that the Vessel was damaged after he delivered it to OMC for inspection and repair[7] of three of the Honda Outboard Engines:

> After a series of errors and seemingly foul play over the course of nine months, the Oceanside Marine Center (1) failed to repair the engines properly, (2) failed to successfully sea trial the Vessel, (3) failed to prove proof of repair of the onboard Kohler generator, (4) crashed the Vessel into a concrete piling and/or stationary dock, (5) repaired the Vessel without notifying Cherewick, (6) failed to disclose the extensive damage to the Vessel to Cherewick, (7) failed to engage a Naval Architect, Marine Surveyor or other Professional engineer to determine the extent to which the Vessel was seaworthy, safe to use, or in need of further repairs and/or scrutiny, (8) and ultimately demanded that Cherewick remove the Vessel out of the OMC yard and its possession in March of 2016.

Mot. at 11:19-12:3 (citing ECF No. 1-2 at 47).

Plaintiff's report also confirmed that OMC had "admitted fault for the Boat's damage via email and telephone call/text to Sean Keating, and by email forwarded to [Plaintiff] via its General Manager, Butch Hainsworth."  ECF No. 1-2 at 48; Mot. at 12:7-13.  However, he stated that "no alarms were sounded" because Mr. Hainsworth "described

---

[6]   Initially, "Cherewick erroneously reported the date of loss to State Farm as occurring in February of 2016."  Mot. at 11:28.

[7]   Again, the Policy expressly stated that losses directly and immediately caused by repairs, service, or maintenance were not covered losses.  Mot. at 17:17-25 (citing ECF No. 1-2 at 36-37 (Section I, Paragraph 1, subsections (a) and (j)).

the damage as '*a minor scratch which was repaired in house*.'"  ECF No. 1-2 at 48; Mot. at 12:7-13.

Plaintiff also "confirmed that no incident report regarding the crash was ever filed with the Oceanside Harbor Police Department."  Mot. at 12:20-21 (citing ECF No. 1-2 at 48).  He advised that "the damage to the Vessel caused by OMC may have penetrated the foam core of the Boston Whaler's hull" and that without cutting into the hull, it would be impossible to tell if the structure of the Vessel had been compromised.  Mot. at 12:21-24 (citing ECF No. 1-2 at 49).  However, on February 29, 2016, Mr. Keating had, in fact, informed Plaintiff of the possibility of hull damage to the Vessel.  Mot. at 12:24-27; *see also* Exhibit 4 to Exhibit 2 to Stargardter Decl., ECF No. 23-4 at 10 (attaching the February 29, 2016 e-mail from Mr. Keating to Plaintiff stating that "the hull could have been cracked" in the allision).

### 8.   *Defendant's Claim Investigation and Denial*

On Monday, October 8, 2018, Ms. Wills reviewed Plaintiff's written statement.  Mot. at 13:2-4 (citing Overstreet Decl., ¶ 7, Ex. 6, SF-CF-0025).  On Tuesday, October 9, 2018, she spoke with Plaintiff, reviewed the facts of the loss with him, and confirmed that OMC damaged the Vessel during a sea trial while the Vessel was in its possession for repairs and service to the motors.  Mot. at 13:4-6 (citing Overstreet Decl., ¶ 7).  She reviewed the Policy language with Plaintiff and explained that the Policy excluded coverage for the damages he was claiming.  Mot. at 13:6-8 (citing Overstreet Decl., ¶ 7).  She suggested that Plaintiff discuss coverage under the liability policy for the shop.  Mot. at 13:8-9 (citing Overstreet Decl., ¶ 7).  Plaintiff requested a certified copy of the Policy.  Mot. at 13:9-11 (citing Overstreet Decl., ¶ 7).  Ms. Wills promised to provide as a copy of the Policy as well as the letter denying the claim.  *Id.*

On October 9, 2018, Plaintiff spoke with Ms. Wills regarding his pending claim, including but not limited to the discovery of the loss.  Oppo. at 18:2-4.  Later that day, Ms. Wills, with her team manager's approval, sent a formal declination letter to Plaintiff.  Mot. at 13:12-14 (citing Overstreet Decl., ¶8, Ex. 9 SF-CF-0025; Doc. 1-2 at Page ID 57-58);

Oppo. at 18:4-9.  The letter explained the reasons why State Farm was declining coverage for the loss and cited to the specific Policy exclusions.  Mot. at 13:14-15 (citing ECF No. 1-2 at 51-52).  It indicated that "the damage to [Plaintiff's] boat caused by Oceanside Marine Center while [his] boat was with them for servicing is excluded from coverage." Compl. at 8, ¶ 23 (attaching Exhibit 3 to the Complaint by reference).  The letter also cited the "Suit Against Us" provision.  Mot. at 13:15-16 (citing ECF No. 1-2 at 52).  On October 10, 2018, Ms. Wills sent Plaintiff a copy of the Policy.  Mot. at 13:16-17 (citing Overstreet Decl., ¶ 9 and Ex. 7).

### 9.    *Plaintiff's Resubmission of His Claim*

On November 28, 2018, Ms. Wills received a letter of representation from attorney Jason Goldstein asking Defendant to reconsider its declination Plaintiff's claim.   Mot. at 13:19-21 (citing ECF No. 1-2 at 54-59, 100); Compl. at 10, ¶ 34 (citing Ex. 4 to Compl.); Oppo. at 18:24-19:2.  On November 30, 2018, Ms. Wills responded, asking Plaintiff to send copies of repair estimates, a statement from the repair, and photos of the damages claimed to the Vessel in order to further evaluate the claim.  Mot. at 13:23-26 (citing ECF No. 1-2 at 97); *see also* Compl. at 10, ¶ 34 (citing Ex. 5 to Compl.).   Meanwhile, on December 4, 2018, Plaintiff sent a letter to OMC regarding his discovery and demanding they appoint a marine surveyor to determine the actual scope and extent of the damage. Oppo. at 16:3-5.  On December 7, 2018, Plaintiff submitted a new claim to Defendant for what appeared to be the same damage.  Mot. at 13:27-28.

On December 12, 2018, Ms. Wills wrote to Mr. Goldstein asking if he represented Plaintiff with respect to the second claim.  Mot. at 13:28-14:2.  She advised that both claims were pending investigation and receipt of photos of the damage and repair estimates from the shop of the insured's choice.  *Id.* at 14:2-3.  She advised that a marine survey may be necessary.  *Id.* at 14:3-4 (citing ECF No. 1-2 at 99); Compl. at 10, ¶ 35 (citing Ex. 6 to Compl.).  On December 18, 2018, Mr. Goldstein informed Ms. Wills that Plaintiff was not reporting a new claim; rather, he was reporting additional damage resulting from the original claim.   Mot. at 14:5-7 (citing ECF No. 1-2 at 101).   He also provided

-11-

documentation addressing the additional claims being made by Plaintiff. *Id.* at 14:7-9 (citing ECF No. 1-2 at 95-114; ECF No. 1-3 at 1-57); Compl. at 10, ¶ 36. On December 24, 2018 as well as January 3, 14, and 16, 2019, Ms. Wills followed up with Mr. Goldstein for additional information about Plaintiff's claim. Mot. at 14:12-15 (citing ECF No. 1-3 at 59, 66-67; Overstreet Decl., ¶¶ 14-17); *see also* Compl. at 10-11, ¶¶ 37-38 (citing Exs. 8 and 9 to Compl.).

Meanwhile, in December 2018, Plaintiff took action to report the allision to the Harbor Unit of the Oceanside Police Department for the first time. Mot. at 10:18-20 (citing Stargardter Decl. at 2, ¶ 6, and Ex. 5, RC 000119-120); *see also* ECF No. 23-7 at 74. On December 24, 2018, Plaintiff wrote Sergeant Joshua Morris from the Oceanside Police Department a letter regarding his desire to file an incident report and his previous unsuccessful attempts to do so. ECF No. 23-7 at 73-74. On December 31, 2018, Sergeant Morris told Plaintiff that "*[a] vessel allision report cannot be taken three years after the fact as too much time has elapsed to accurately capture the events and/or visible damage*." Mot. at 10:20-23 (citing ECF No. 23-7 at 75, Ex. 5, RC 000146) (Emphasis added).

On January 3, 2019, Ms. Wills sent a reservation of rights letter to Plaintiff's counsel, which, *inter alia*, reserved Defendant's rights to decline coverage on the bases that (1) Plaintiff's loss was not caused by a peril insured against and (2) Plaintiff had failed to comply with Policy conditions. Mot. at 14:15-17 (citing ECF No. 1-3 at 66); Compl. at 10, ¶ 38 (citing Ex. 9 to Compl.); Oppo. at 19:3-7 (citing Cherewick Decl. at 11, ¶ 37).

### 10. *Defendant's Retention of Marine Surveyor to Investigate the Claim*

On January 21, 2019, Defendant retained Todd & Associates, Marine Surveyors, to conduct a survey of the Vessel. Mot. at 14:20-21 (citing Overstreet Decl. ¶ 19); Oppo. at 197-10. On February 14, 2019, Bill Trenkle, Marine Engineer, AMS, CMI, of Todd & Associates ("Mr. Trenkle") provided Defendant with a written report regarding the damage. Mot. at 14:21-23 (citing ECF No. 1-3 at 84-105).

Mr. Trenkle spoke with Mr. Hainsworth from OMC and Mr. Gayoso, who repaired the damage to the Vessel caused by the allision. Mot. at 14:24-25 (citing ECF No. 1-3 at

85-86).  He also provided copies of e-mail communications between OMC, Mr. Keating, and Plaintiff about the November 18, 2015 allision and the other repair work performed by OMC with his report.  Mot. at 14:25-28 (citing ECF No. 1-3 at 99-104).  Mr. Trenkle's report stated:

> It is the professional opinion of the undersigned surveyor and marine engineer, that the vessel suffered damage to the bow and portside aft at the hull door while the vessel was being serviced by OMC, **but did not suffer any significant hull** or **deck structural damage**. The fiberglass damage sustained was easily repaired and the vessel is no weaker or more unsafe than it was prior to the incident.
>
> OMC made repairs to the damages that occurred during a slow speed allision with a concrete piling and a sideswipe of bolts sticking out of a dock.  According to the fiberglass repair technician, who did the work, and who the undersigned is familiar with, the damage was on the outer hull laminates and did not penetrate into the vessel core.  Percussion sounding of the hull and deck and inspections inside the vessel did not reveal any indications that there were any delamination or remaining damage.

Mot. at 15:1-11 (citing ECF No. 1-3 at 94-95) (emphasis added).

First, Mr. Trenkle addressed Plaintiff's concern that the Vessel was structurally compromised due to the allision, stating that "as a composites expert and Marine Engineer, the undersigned can confirm that there is no structural damage to the hull that has weakened it or made it structurally unsafe."  Mot. at 15:12-17 (citing ECF No. 1-3 at 95).

Second, Mr. Trenkle indicated that "[t]he biggest issues observed were cosmetic."  Mot. at 15:18-23 (citing ECF No. 1-3 at 95).  He elaborated that (1) "[t]he gelcoat repair on the hull, at the bow, does not match well"; (2) "[t]he gelcoat repair on the deck to the molded nonskid is also of poor quality and the color of the gelcoat does not match well"; and (3)  "the repair of the scratch at the hull side door, the repair area of which is 3" x 6" does not match well either."  *Id.* at 15:18-23 (citing ECF No. 1-3 at 95).  However, Mr. Trenkle noted that all of the aforementioned issues were also the same issued reported to

Plaintiff on February 23, 2016, and observed by him on March 16, 2016.  Mot. at 15:24-27 (citing ECF No. 1-3 at 99, (Ex. 2, Request for Admission No. 6, and Ex.4 to RFA, Ex. 3 Responses to Request for Admission No. 6; Doc. 1-3 at 100).

Third, Mr. Trenkle determined the neither the damage to the rub rail on the portside of the Vessel nor the 2.5" x 0.125" gouge in the red stripe on the starboard side of the Vessel reported by Plaintiff was consistent with the allision of the Vessel with a concrete piling with the bow or the gouge caused when the boat was removed from the water.  Mot. at 15:28-16:4 (citing ECF No. 1-3 at 91, 96).  The damage to the rub rail would have been visible to Mr. Gayoso when he made repairs to the boat and also would have been visible to Plaintiff when he was on the boat in March of 2016.  *Id.* at 16:4-6 (citing ECF No. 1-3 at 96).  Mr. Trenkle determined that this damage most likely occurred while the Vessel was in storage for 2 ½ years or when being moved to the Boat Grotto for maintenance.  *Id.* at 16:6-9 (citing ECF No. 1-3 at 91, 96).  The only damage to the boat caused by the allision— was repaired by OMC.  *Id.* at 16:9-10 (citing ECF No. 1-3 at 97).

Fourth, Mr. Trenkle opined that Plaintiff's claim that OMC had damaged the generator was contradicted by evidence in the form of emails from Plaintiff and Mr. Keating which indicated that the generator was undergoing trouble shooting by a mechanic not associated with OMC.  Mot. at 16:11-14 (citing ECF No. 1-3 at 96-97).  Mr. Trenkle noted that saltwater in the generator is associated with the engine being cranked too many times with it not starting, and that nothing pointed to OMC causing water to enter the cylinders of a generator 2½ years before the insured discovered that problem.  *Id.* at 16:14-17 (citing ECF No. 1-3 at 97).

Finally, Mr. Trenkle noted that Plaintiff suffered some damage to the Vessel that was not repaired correctly by OMC, but that "the bulk of his problems appear to be due to the vessel sitting for 2½ years unattended on a trailer in a dirty and disorganized towing yard" and that "evidence inside the vessel indicated that it has flooded with rainwater in the recent past."  Mot. at 16:19-23 (citing ECF No. 1-3 at 97).

/ / /

-14-

### 11.   *Defendant's Second Denial of Plaintiff's Claim*

On February 20, 2019, after Ms. Wills reviewed the loss as submitted by Plaintiff and the Todd & Associates Report with her team manager, she sent a letter to Mr. Goldstein confirming Defendant's original coverage decision denying the claim and citing other exclusions applicable to the loss based on the additional information provided by Plaintiff. Mot. at 16:25-17:1 (citing ECF No. 1-3 at 80-83); *see also* Compl. at 11, ¶ 42 (attaching Ex. 13 to Compl.); Oppo. at 19:12-16 (citing Cherewick Decl. at 11, ¶ 39; Goldstein Decl. ¶¶ 4-5). This letter included a copy of Mr. Trenkle's report and cited the "Suit Against Us" provision in the Policy. Mot. at 17:1-3 (citing ECF No. 1-3 at 8105).

On January 8, 2020, Louis Mencuccini, Jr., a Certified Professional Yacht Broker ("CPYB")[8] and Level I Thermographer ("Mr. Mencuccini"), inspected the Vessel and prepared a report on January 14, 2020. Oppo. at 21:1-3. He conducted visual exterior, percussion, deck percussion, thermal imaging,[9] and interior damage inspection on the Vessel. Oppo. at 21:24-26 (citing Mencuccini Dec., ¶ 8-20). Mr. Mencuccini's inspection discovered damage to the Vessel, which lowered its value and was not "cosmetic" in nature. Oppo. at 22:3-5 (citing Mencuccini Dec., ¶¶ 10-20). He opined that this damage could not have been discovered by Mr. Cherewick, as he is a layman that could not detect the damage, which was hidden below the fiberglass repair work. *Id.* at 22:5-7 (citing Mencuccini Dec., ¶¶ 12, 14). More specifically, Mr. Mencuccini concluded, among other things, as follows:

- As a result of inspecting the bow from the interior, it is noted that the port interior bow where the deck is bonded to the hull there was almost an inch difference in spacing (higher on portside) than on the starboard side. The starboard side deck rests flush on the hull liner while the port side has space. Upon

---

[8]   A CPYB is a certification that recognizes that a yacht broker has achieved the highest level of industry accreditation, available only to fully-qualified yacht sales professionals. Oppo. at 21:3-6 (citing Declaration of Louis Mencuccini, Jr. ("Mencuccini Dec."), ¶¶ 1-3).

[9]   Plaintiff points out that Todd & Associates, Inc. did not use thermal imaging. Oppo. at 21:26-27 (citing Goldstein Dec., ¶ 5).

-15-

visual inspection one can see screws that hold the deck to the hull have pulled thru and have fiberglass strands on them.

- Thermal imaging showed no signs of moisture in the hull or deck, but did show a thinner area where the dock had been patched.  On the interior, thermal does show a difference in the gap where the hull and deck meet. At some point, this needs to be investigated at a mechanical level.

- Percussion testing sounded dull at the lip and patch at the port side bow indicative of a low quality repair.  Also, the sounding differences was confirmed by the visual inspection.  Visual inspection of the deck showed spider cracks in the gel coat but not the laminate at the bow around the points of impact, behind the windlass and near the first port stanchion along with the mismatched nonskid pattern.  In the interior, there is a measurable difference from the portside hull/deck match up to the starboard hull deck match up.

- The anomalies discussed herein have damaged the Vessel, caused it to lose value and would have to be disclosed to any potential buyer of the Vessel.

Oppo. at 22:7-24 (citing Cherewick Decl. at 12, ¶ 43 and Ex. 17).  Notably, Mr. Mencuccini neither discusses the impact of Plaintiff having the Vessel in dry storage for two and half years nor responds to Mr. Trenkle's opinions that storage may have contributed to some of Plaintiff's damages.

**B.   <u>Procedural History</u>**

On February 1, 2019, Plaintiff filed suit against Oceanside Marine Center, Inc., Butch Hainsworth, and Jorge Gayoso, alleging causes of action for (1) negligence; (2) negligent misrepresentation; and (3) fraud.  *See Cherewick v. Oceanside Marine Center, Inc.*, San Diego Superior Court Case No. 37-2019-00006428-CU-FR-CTL (the "OMC Action"); *see also* Mot. at 18:27-19:2 (citing Request for Judicial Notice, Stargardter Decl. at 2-3, ¶ 8 Ex. 13).  The Complaint asserts the same claims of wrongdoing against OMC as alleged in Plaintiff's statement of loss submitted to State Farm on October 8, 2018.  Mot. at 19:2-6 (citing *Ibid.*).

Almost nine months later, on November 25, 2019, Plaintiff filed his complaint in the

San Diego Superior Court (*i.e.*, this case) for (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing against Defendant. *See* ECF No. 1 at 2:15-19; *see also Cherewick v. State Farm Fire & Casualty*, San Diego Superior Court Case No. 37-2019-00062809-CU-BC-CTL (the "State Action"); Mot. at 19:7-10. On April 10, 2020, Defendant timely removed the case to federal court after being served on March 11, 2020. ECF No. 1 at 1:24-26. On April 15, 2020, Defendant filed a Motion to Dismiss pursuant to Rule 12(b)(6). ECF No. 2. On July 14, 2020, the Court denied Defendant's Motion to Dismiss. ECF No. 6.

Notably, although Defendant's Motion to Dismiss sought dismissal on the same grounds relied upon in its current Motion for Summary Judgment, the Court denied Defendant's Motion to Dismiss by "considering all facts in the light most favorable to the plaintiff," and while assuming the truth of all allegations. *See, e.g.*, *Cherewick v. State Farm Fire & Cas.*, No. 3:20-cv-00693-BEN-MSB, 2020 WL 3971515, at *4 (S.D. Cal. July 14, 2020) (Benitez, J.) ("Accordingly, considering all facts in the light most favorable to the plaintiff, the Court finds factual allegations in the Complaint plausibly allege the Plaintiff was not on notice of appreciable damage prior to September 2018."). The Complaint did not attach certain e-mails which the Court has before it now. It also did not include allegations that Plaintiff himself rode on the Vessel in March of 2016. *See* Compl. at 6, ¶ 16 (alleging Plaintiff's authorized representative, but not Plaintiff himself, attended a meeting at OMC to see whether OMC had properly repaired the generator). On July 28, 2020, Defendant filed its answer. ECF No. 7.

On July 26, 2020, Defendant filed its Motion for Summary Judgment. ECF No. 23. On August 6, 2021, Plaintiff filed its Opposition. Opposition, ECF No. 24. On August 16, 2021, Defendant filed its reply brief, Reply, ECF No. 25 ("Reply"), and Evidentiary Objections to Plaintiff's Declaration and the Declaration of Jason Goldstein, ECF No. 26.

On June 1, 2021, Plaintiff filed a Notice of Settlement of Entire Case as to the OMC Action. *See* ECF No. 23-10 at 2; *see also* Mot. at 19:4-6 (citing Request for Judicial Notice, Stargardter Decl. at 2, ¶ 9, Ex. 14).

### III.   LEGAL STANDARD

Where a moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court must grant summary judgment.  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The moving party may make this showing by identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If a moving party carries its burden of showing the absence of evidence as to an essential element of the opposing party's case (e.g., a genuine issue of material fact), "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010); *see also Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009).  "This burden is not a light one." *Oracle*, 627 F.3d at 387.  The party opposing the motion for summary judgment "must show more than the mere existence of a scintilla of evidence" by coming forward "with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*  The nonmoving party must go beyond the pleadings and designate facts showing a genuine issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).  It can do this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor. FED. R. CIV. P. 56(c).

The court also draws inferences from the facts in the light most favorable to the nonmoving party.  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the nonmoving party's mere allegation that factual disputes exist

between the parties will not defeat an otherwise properly supported motion seeking summary judgment.  *See* FED. R. CIV. P. 56(c).  Further, if the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  *Matsushita*, 475 U.S. at 587.

"Whether an issue is a question of law or a question of fact is a substantive question, to which state law applies." *Encompass Ins. Co. v. Coast Nat. Ins. Co.*, 764 F.3d 981, 984 (9th Cir. 2014).  The substantive law governing a claim also determines whether a fact is material.  *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009).  Here, "California's substantive insurance law governs in this diversity case." *Encompass*, 764 F.3d at 984; *see also Airborne San Diego, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 3:19-cv-00899-WQH-AHG, 2021 WL 1853602, at *5 (S.D. Cal. May 10, 2021) (Hayes, J.) (applying California law) ("Federal courts apply state law to interpret an insurance policy.").

## IV.   **DISCUSSION**

Defendant argues that it is entitled to summary judgment on Plaintiff's Complaint in its entirety because first, Plaintiff's breach of contract claim fails, as a matter of law, due to the (1) "Suit Against Us" provision and (2) Policy exclusions for wear, tear, faulty repairs, and faulty maintenance.  Mot. at 8:16-19.  It contends that because Plaintiff's breach of contract claim fails as a matter of law, so do his claims for bad faith and punitive damages.  *Id.* at 8:19-20.  Defendant also argues that even assuming the Court finds that it erred in declining coverage for Plaintiff's claim, a genuine dispute[10] existed as to whether (1) the "Suit Against Us" provision applied and (2) the Policy exclusions applied.  Mot. at

---

[10]   The "genuine dispute" doctrine "enables an insurer to obtain summary adjudication of a bad faith cause of action by establishing that its denial of coverage, even if ultimately erroneous and a breach of contract, was due to a genuine dispute with its insured." *Bosetti v. United States Life Ins. Co. in City of New York*, 175 Cal. App. 4th 1208, 1237 (2009) (quoting *Chateau Chamberay Homeowners Assn. v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001)).  This doctrine "may be applied where the insurer denies a claim based on the opinions of experts." *Airborne*, 2021 WL 1853602, at *13 (quoting *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000)).

8:19-23.   Thus, Plaintiff cannot meet his burden of proving State Farm's conduct was unreasonable, let alone fraudulent, malicious, or oppressive.   Mot. at 8:23-24.  Plaintiff opposes by arguing the Court should deny summary judgment because genuine issues of fact exist as to (1) when Plaintiff discovered his claims, and therefore, whether the "Suit Against Us" provision bars his claims, and (2) the applicability of the exclusions, which he alleges are based on undefined terms that are vague and ambiguous.   Oppo. at 24:26-27:23. Thus, he contends that his claims for breach of contract and breach of the implied covenant of good faith and fair dealing should proceed to trial.   *Id.* at 27:24-30:10.

The following facts are undisputed: From December 31, 2014 through December 31, 2015, the Policy covered Plaintiff's Vessel.  Mot. at 5:16-17; Oppo. at 16:16-18.   In addition to other exclusions, the Policy contained Exclusion I(1)(j), which explicitly stated that Defendant would not cover a loss to the Vessel "directly and immediately caused by …. repairing, renovating, servicing, or maintenance."  *See* Compl. at 9, ¶ 28; *see also* ECF No. 23-13 at 19-20.   In early July 2015, Plaintiff took the Vessel to OMC to repair of the Honda outboard engines.  Mot. at 9:4-5; Oppo. at 7:10-12.  Almost four months later, on November 18, 2015, OMC damaged Plaintiff's Vessel while conducting a sea trial and notified Plaintiff of the incident that same day both by telephone and e-mail.  Mot. at 7:18-21, 10:3-7; Oppo. at 7:14-17, 11:9-12.  Almost three years after the damage, on October 6, 2018, Plaintiff first reported Claim No. 47-6061-X22 (the "First Claim") for "[d]amage to the boat [which] occurred while a sea trial test was being done by the shop" to Defendant. ECF No. 23-12 at 8; Oppo. at 16:27-17:12.   On October 9, 2018, the First Claim was denied.  Mot. at 13:12-14; Oppo. at 18:2-9.  On December 7, 2018, Plaintiff reported a second claim, Claim No. 756847C55, for additional damages resulting from the original claim.  Mot. at 13:27-28; ECF No. 23-12 at 7.  On February 20, 2019, Defendant denied the Second Claim.  Mot. at 16:26-17:3; Oppo. at 19:12-16.

In sum, this case arises from Defendant's denial of two claims submitted by Plaintiff to his insurance carrier.  As to the first claim, the case resolves around one sole issue of first impression: Does the Policy cover an accident arising during a sea trial—what is

1   essentially the maritime equivalent of a test drive, or does Exclusion 1(j) exclude coverage?

2   This Court finds that damage arising during a sea trial is excluded under a repair exclusion.

3   As to the second claim, the Court finds that the various other Policy exclusions also prevent

4   Defendant from providing coverage for the damage at issue in this case.

5       Consequently, the Court **GRANTS** Defendant's Motion for Summary Judgment.

6   However, before proceeding to Defendant's Motion, the Court addresses both parties'

7   evidentiary objections along with Defendant's Request for Judicial Notice given its ruling

8   on these issues will affect the evidence it considers when ruling on this Motion.

9       **A.    Evidentiary Objections**

10       Defendant submitted thirty-five (35) pages of objections to Plaintiff's Evidence in

11   Support of his Opposition to Defendant's Motion for Summary Judgment, namely to

12   almost every single paragraph of Plaintiff's Declaration as well as the Declaration of his

13   attorney, Jason E. Goldstein, Esq.  *See* ECF No. 26.

14       In moving for or opposing summary judgment, "[a] party may object that the

15   material cited to support or dispute a fact cannot be presented in a form that would be

16   admissible in evidence."  FED. R. CIV. P. 56(c)(2).  Further, "[a]n affidavit or declaration

17   used to support or oppose a motion must be made on personal knowledge, set out facts that

18   *would be* [but not necessarily is] admissible in evidence, and show that the affiant or

19   declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4) (emphasis

20   added).  Under this standard, "when evidence is not presented in an admissible form in the

21   context of a motion for summary judgment, *but it may be presented in an admissible form*

22   *at trial*, a court may still consider that evidence."  *Burch v. Regents of Univ. of Cal.*, 433

23   F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) (*emphasis* in original) (citing *Fraser v. Goodale*,

24   342 F.3d 1032, 1037 (9th Cir. 2003).  Given the sheer volume of evidentiary objections,

25   the Court addresses Defendant's categorically rather than individually.  However, the Court

26   finds that even though it overrules all of Defendant's objections, Defendant has suffered

27   no prejudice given the Court has granted its Motion.

28       First, Defendant objects to numerous paragraphs in the declarations of Plaintiff and

-21-

his counsel as lacking foundation under Rule 901 of the Federal Rules of Evidence. "[O]bjections predicated upon Federal Rule of Evidence 901 are appropriate in the context of a motion for summary judgment." *Burch*, 433 F. Supp. 2d at 1120.  For evidence to be admissible, Federal Rule of Evidence 901(a) requires a proper foundation be laid to authenticate the item by "evidence sufficient to support a finding that the item is what the proponent claims it is." *See Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir. 1987).  Such a foundation may be laid by testimony of a witness who has personal knowledge.  FED. R. EVID. 901(b)(1).  "A document which lacks a proper foundation to authenticate it cannot be used to support [or defend against] a motion for summary judgment." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1551 (9th Cir. 1989).  "To be considered by the court, 'documents must be authenticated by and attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'"  *Hal Roach*, 896 F.2d at 1550-51 (quoting *Blain's Helicopters*, 831 F.2d at 925).  Thus, where a district court relies on an unauthenticated document that could be authenticated at trial by either a witness with competent personal knowledge, FED. R. EVID. 901(b)(1), or a certified copy of the document accompanied by an affidavit from a custodian of records, its reliance on that document is harmless error.  FED. R. EVID. 901(b)(7).  *Id.* at 1551.  Moreover, "objections to the *form* in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's evidence." *Id.* (citing *Celotex*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c)").  This is because the moving party is the party charged with the burden of showing no genuine issue of fact exists.  The nonmoving party, on the other hand, could defeat a motion for summary judgment by merely advancing legal arguments explaining how a genuine issue of fact exists without proffering any exhibits or evidence.  Here, the Court finds Defendant's objections that various statements in Plaintiff's Declaration lack foundation unmeritorious.  Thus, after reviewing all objections to Plaintiff's Declaration, all of Defendant's objections on the

basis that various statements lack foundation are **OVERRULED**.

Second, Defendant objects that various terms in the declarations are vague and ambiguous.  Until Defendant raised its objections, the Court had not even read, and thus, did not intend to rely on, any of the objectionable statements by Plaintiff.  However, as in *Burch*, "[b]ecause defendant[ ] ha[s] thrown these affidavits into the spotlight … , the court doubts that it can rely on *Carmen* for the proposition that it need not consider their contents."  433 F. Supp. 2d at 1123; *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001) (holding that in determining whether there is a genuine issue of fact on summary judgment, the district court may make that determination based on the papers submitted on the motion and any other papers or evidence to which they refer but is not required to consider other materials).  That being said, because the Court relied on Defendant's moving papers, exhibits, and evidence—rather than the declarations at issue—in ruling on this Motion, all objections to various terms in Plaintiff's Declaration as vague and ambiguous are **OVERRULED**.  *See, e.g.*, *Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Lab. Ass'n of the United States of Am. Pension Tr.*, 153 F. Supp. 3d 1217, 1236 (E.D. Cal. 2015) (declining to address objections that the plaintiffs' declarations were vague and ambiguous).

Third, Defendant objects that various paragraphs in the declarations are irrelevant, lack personal knowledge (*i.e.*, are speculative), and/or qualify as an improper legal conclusion.  *See* ECF No. 26.  The *Burch* court, when faced with similar objections, explained why such objections are misplaced in a motion for summary judgment:

> For example, objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself; yet attorneys insist on using evidentiary objections as a vehicle for raising this point.  A court can award summary judgment only when there is no genuine dispute of *material* fact.  It cannot rely on irrelevant facts, and thus relevance objections are redundant.
>
> . . . .
>
> Instead of *objecting,* parties should simply *argue* that the facts

1
2
3
4
5
6
7

are not material.  Similarly, statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment.  Objections on any of these grounds are simply superfluous in this context.  *See, e.g., Smith v. County of Humboldt,* 240 F.Supp.2d 1109, 1115-16 (N.D. Cal. 2003) (refusing to rule on the evidentiary objections in defendant's reply because "even if the evidence submitted by plaintiff is considered by this Court, plaintiff fails to state a colorable claim"). Again, instead of challenging the admissibility of the evidence, lawyers should challenge its sufficiency.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Burch*, 433 F. Supp. 2d at 1119; *see also US E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1052 (E.D. Cal. 2015) ("Because the court does not rely on irrelevant evidence when considering motions for summary judgment, such objections are redundant to the practice of summary judgment itself.").  The Court agrees that some of the statements in Plaintiff's Declaration may qualify as improper legal conclusions.  However, agreeing with the *Burch* court that Defendant's objections—particularly, the relevance objections—are redundant of the summary judgment standard itself, the Court **OVERRULES** all of Defendant's objections that statements in Plaintiff's Declaration are irrelevant, lack personal knowledge (*i.e.*, are speculative), and/or qualify as an improper legal conclusion.  The Court did not consider any of Plaintiff's legal conclusions when ruling on this Motion.  Defendant's two relevance objections to Paragraphs 8 and 9 of Mr. Goldstein's Declaration are likewise **OVERRULED**.

Fourth, Defendant objects that various paragraphs also qualify as hearsay without an exception.  On the one hand, hearsay evidence is generally inadmissible unless a federal statute or rule provides otherwise.  FED. R. EVID. 802; *see also* Fed. R. Evid. 801(c) (defining "hearsay" as a statement that a declarant does not make while testifying in court and offers into evidence to prove the truth of the matter asserted).  Because summary judgment qualifies as a substitute for a trial, and hearsay (absent an exception or exclusion) is inadmissible at trial, a motion for summary judgment may not be ***supported by*** hearsay. *Burch*, 433 F. Supp. 2d at 1121.  Courts have likewise held that papers opposing a motion

1   for summary judgment may also not be supported by hearsay.  *Id.*

2         On the other hand, as long as a court finds that hearsay evidence could be presented

3   in an admissible form at trial (*i.e.*, through testimony from a witness laying the foundation

4   for an exception or because the Court finds the evidence to be non-hearsay), it may consider

5   the evidence when ruling on the motion for summary judgment.  *See* Fed. R. Civ. P.

6   56(c)(4); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110

7   (9th Cir. 2016) (noting that "at summary judgment a district court may consider hearsay

8   evidence submitted in an inadmissible form, so long as the underlying evidence could be

9   provided in an admissible form at trial, such as by live testimony"); *Fraser*, 342 F.3d at

10   1037 ("Because the diary's contents could be presented in an admissible form at trial, we

11   may consider the diary's contents in the Bank's summary judgment motion.").  Further,

12   recognizing that a party opposing summary judgment seeks only to show that a genuine

13   issue of fact remains for trial rather than to prove that party's case, courts have treated "the

14   opposing party's papers more indulgently than the moving party's papers."  *Burch*, 433 F.

15   Supp. 2d at 1121 (citing *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985).  Finally,

16   where a defendant only generally objects to a document by arguing that it contains hearsay,

17   the Court is not required "to comb through these documents, identify potential hearsay, and

18   determine if an exception applies—all without guidance from the parties."  *Burch*, 433 F.

19   Supp. 2d at 1124.

20         Here, many of Defendant's objections are simply not hearsay at all.  For instance,

21   Defendant objects to Paragraph 14 of Plaintiff's Declaration, which states, "Mr. Keating

22   had no responsibility to oversee the repairs being conducted by Defendants to the Vessel,

23   which was my responsibility."  ECF No. 26 at 7:1-7.  Nothing in this statement is hearsay.

24   Defendant also objects that this statement lacks foundation and is an improper legal

25   conclusion when that is not the case.  Other statements, which Defendant objects to as

26   "hearsay without an exception," are either not hearsay or do, in fact, fall within an

27   exception.  For instance, Defendant objects to Paragraph 15 of Plaintiff's Declaration,

28   which states, "In early 2016, Mr. Keating went to visit the Vessel and informed me that he

believed that the damage represented to me by Oceanside and Mr. Hainsworth was not minor," *id.* at 7:8-14, as lacking foundation, calling for an improper legal conclusion, and hearsay without an exception.  However, this along with many other statements to which Defendant objects to as "hearsay without an exception" fall within the exception for then-existing mental or emotional conditions.  These statements are not offered for the truth of the matter asserted (*i.e.*, to prove what Mr. Keating believed) but rather to prove what Plaintiff believed and why he did not investigate the damage to the Vessel sooner, which also means that to the extent this statement is hearsay, it falls within the exception for then-existing mental or emotional conditions.  *See* FED. R. EVID. 803(3) (providing that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) … is excluded from the rule against hearsay).  Further, to the extent any declarant makes statements regarding matters of which he or she does not have personal knowledge, or which constitute legal conclusions, the Court does not rely on them in resolving the pending Motion.  Finally, the Court finds that Defendant has not clearly stated which portions of the cited paragraphs qualify as hearsay and why.  Thus, the Court **OVERRULES** all of Defendant's hearsay objections.

Plaintiff also submitted similar objections (albeit far less numerous) to the Declaration of Doug Overstreet in Support of Defendant's Motion, objecting that Paragraphs 26 and 27 of the declaration lack foundation, qualify as an improper lay witness opinion, are an improper expert witness opinion, constitute hearsay without an exception, and are an improper legal conclusion.  These objections are also **OVERRULED** for the same reasons that the Court overruled Defendant's objections.

### B. <u>Request for Judicial Notice</u>

Defendant asks the Court to take judicial notice of the (1) Complaint filed in the OMC Action and (2) Notice of Settlement filed in the OMC Action, both of which were respectively filed as Exhibits 13 and 14 to the Declaration of GailAnn Y. Stargardter.  It is well-established that courts may take judicial notice of the pleadings, filings, and court records of any court.  *See*, *e.g.*, *Rand v. Rowland*, 154 F.3d 952, 961 (9th Cir. 1998) (noting

that "[f]or example, judicial notice by the district court of its own records, either at the behest of the defendant or *sua sponte,* may disclose that the plaintiff had recently been served . . ."); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (providing that "a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases"); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (taking judicial notice of court records).  Thus, the Court **GRANTS** Defendant's Request for Judicial Notice and takes judicial notice of the fact that (1) Plaintiff filed a separate lawsuit against OMC, and (2) on June 1, 2021, Plaintiff filed a Notice of Settlement in the OMC Action.

### C. <u>Summary Judgment is Proper Because No Genuine Issue of Fact Exists as to Plaintiff's Claims.</u>

As stated, Plaintiff's Complaint alleges claims for breach of contract and breach of the duty of good faith and fair dealing.  As outlined below, because the undisputed facts establish that Plaintiff cannot prove two of the four elements for his breach of contract claim, no genuine issue of fact exists as to whether Defendant breached the contract. Further, because the Court finds no coverage for Plaintiff's two claims, his claim for breach of the duty of good fair and fair dealing also fails as a matter of law.

#### 1. *<u>Breach of Contract</u>*

Defendant moves for summary judgment on the breach of contract claim by arguing that it fails because (1) Plaintiff has failed to meet the conditions under the Policy, namely, compliance with the "Suit Against Us" provision, and (2) his loss is excluded under the terms of the Policy.  ECF No. 23 at 2, ¶ 2.

A plaintiff pleading a claim for relief for breach of contract under California law must show (1) a legally enforceable contract between the parties; (2) the plaintiff's performance or excuse for non-performance; (3) the defendant's breach of that contract (e.g., by failing to perform or performing inadequately); and (4) damage to the plaintiff caused by the defendant's breach.  *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017); *see also* Oppo. at 27:26-28:1 (citing same elements).

Here, neither party disputes that (1) a valid contract (*i.e.*, the Policy exists between Plaintiff and Defendant) existed at the time of Plaintiff's loss, under which Plaintiff had paid the required premiums,[11] or (2) Plaintiff suffered damages.[12]  Mot. at 7:4-25; Oppo. at 7:14-17, 16:16-18.  Thus, the parties only dispute whether (1) Plaintiff performed under the Policy and (2) Defendant breached its policy obligations under the Policy.  Mot. at 21:6-11, 24:10-12; Oppo. at 28:2-6.  Defendant contends that Plaintiff has failed to prove

---

[11]     Plaintiff attached the alleged "contract" at issue—the Policy—as Exhibit "1" to the Complaint.  *See* Compl. at 7, ¶ 10 (pleading that he attached the Policy as Exhibit 1 to his Complaint); *see also* FED. R. CIV. P. 10(C) (explaining that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes").  The purported "contract" attached to the complaint is not a fully executed contract but rather an unsigned insurance policy.

[12]     Although the parties do not dispute that Plaintiff suffered damages, it is unclear whether Plaintiff received full compensatory damages for the damage OMC caused to the Vessel in the OMC Action.  If he did, payment by Defendant for those same damages might result in double recovery, which could result in a right of subrogation accruing to Defendant under the Policy.  "Subrogation is an equitable doctrine that permits an insurance company to assert the rights and remedies of an insured against a third party tortfeasor."  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 596 F. Supp. 2d 1314, 1317-18 (C.D. Cal. 2008), *aff'd,* 598 F.3d 1115 (9th Cir. 2010) (citing *Allstate Ins. Co. v. Mel Rapton, Inc.*, 77 Cal. App. 4th 901 (2000)).  The doctrine serves "to prevent the insured from obtaining a double recovery (and thus being unjustly enriched) and to place the responsibility for paying the loss on the party who caused the loss."  *Id.* at 1318.  Thus, "[w]hen an insurance company pays out a claim on a first-party insurance policy to its insured, the insurance company is subrogated to the rights of its insured against any tortfeasor who is liable to the insured for the insured's damages."  *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 272 (2005).

     Here, the Policy contains a provision expressly providing that if Plaintiff did not waive his rights of recovery against a third-party, like OMC, Defendant "can require an assignment of rights of recovery for a loss to the extent that payment is made by us."  ECF No. 1-2 at 41.  Thus, even if the Court determined that a genuine issue of fact exists, and this case proceeded to trial, resulting in recovery to Plaintiff on his breach of contract claim, Plaintiff might have to pay some or all of the amounts he received from OMC to Defendant.  *Id.*  Plaintiff acknowledges these rights by arguing that due to OMC's failure to comply with his request and Defendant's denial of his claim, Plaintiff had to file suit against OMC "when [Defendant] should have paid his claim and pursued Oceanside in subrogation."  Oppo. at 16:11-15 (citing Cherewick Decl. at 8, ¶ 29).

-28-

a genuine issue of fact exists as to (1) his own nonperformance due to his failure to comply with the "Suit Against Us" provision and (2) Defendant's breach because Plaintiff does not have a covered loss. Mot. at 7:3-13. Plaintiff responds that (1) "genuine issues of material fact exist[ ] as to whether [he] did not discover his claims until September 2018" and (2) Defendant breached the Policy because the damage does not, in fact, fall under any exclusions. Oppo. at 25:14-19, 27:4-10.

The Court addresses the claimed breach first. It finds no genuine issue of material fact exists as to whether Defendant breached the contract (*i.e.*, the Policy) by denying a claim for a loss that fell under a Policy exclusion. Incidentally, the Court also notes that no genuine issue of fact exists as to Plaintiff's nonperformance, but even if a genuine issue of fact existed on that element, judgment as a matter of law in Defendant's favor would still be appropriate.

a. *Defendant's denial of the First Claim did not breach the contract*

Plaintiff's Complaint alleges that Defendant breached its duties and obligations under the Policy in October 2018 and February 2019, by failing to (1) diligently investigate Plaintiff's claims and (2) provide Policy benefits due to Plaintiff. Compl. at 12, ¶ 47. Defendant contends that because Plaintiff failed to meet his burden of proving Defendant breached the Policy contract due to the fact that Plaintiff's claims fall within an exclusion, Defendant is entitled to summary judgment in its favor on Plaintiff's first claim for breach of contract. Mot. at 28:15-17. Plaintiff responds that Defendant breached "by not paying a covered claim due to the fact that the Vessel was damaged by the negligent operation of the Vessel while in the Pacific Ocean which results in a covered loss under the Insurance Policy." Oppo. at 28:3-6.

"[I]nterpretation of an insurance policy is a question of law." *Encompass*, 764 F.3d at 984 (quoting *Ameron Int'l Corp. v. Ins. Co. of State of Penn.*, 50 Cal. 4th 1370, 1378 (2010)). Courts apply general rules of contract interpretation when interpreting an insurance contract under California law. *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999); *see also Manzarek*, 519 F.3d at 1031. Under those rules, "[i]n construing the

-29-

language of an insurance policy, a court should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 218 (1980) (citations omitted). "Where contract language is clear and explicit and does not lead to an absurd result, the court ascertains the parties' intent from the written provisions and goes no further." *Airborne*, 2021 WL 1853602, at *5 (quoting *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 372 (2001) (citing CAL. CIV. CODE §§ 1638, 1639; *AIU Ins.*, 51 Cal. 3d at 822); *Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992) (if policy language is "clear and explicit, it governs"). Finally, when interpreting a policy, "*insurance coverage is interpreted broadly so as to* afford the greatest possible protection to the insured, [whereas] exclusionary clauses are interpreted narrowly against the insurer." *Manzarek*, 519 F.3d at 1032 (citing *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (internal quotation marks and citation omitted) (bracketed text in original); *see Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996) (recognizing that "exclusions are strictly interpreted against the insurer"). "The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *Manzarek*, 519 F.3d at 1032 (citing *MacKinnon*, 31 Cal. 4th at 648).

Plaintiff alleges a failure to provide Policy benefits and a corollary failure to investigate. Because an insurer has no duty to investigate those claims where a contract unambiguously precludes liability for the claims asserted, the Court addresses Plaintiff's alleged breach by failing to provide Policy benefits first because if there are no owed policy benefits, there is no breach by failing to investigate. *See, e.g.*, *Cont'l Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1083-84 (9th Cir. 1985) (affirming summary judgment in favor of the insurer because where "the contract unambiguously excluded coverage for all claims asserted," the carrier had no duty to investigate before denying coverage) (applying California law). As outlined below, the Court concludes that the unambiguous language of the Policy indicates that regardless of whether Plaintiff's damages were caused by OMC's negligent repairs, normal wear tear of the Vessel, or Plaintiff's neglect in caring

-30-

for the Vessel, none of the damages are covered under the Policy.  As a result, the Court finds that the undisputed evidence in this case shows that (1) no genuine issue of fact exists as to whether Defendant breached the Policy because his damages are excluded and (2) as a result, Defendant had not duty to investigate.  *See also Blue Isle of Cal., Inc. v. Hartford*, No. cv-01-02405-CAS-MANX, 2002 WL 34455175, at *8 (C.D. Cal. Mar. 13, 2002), *aff'd*, 66 F. App'x 704 (9th Cir. 2003) (noting "[t]here is no duty to investigate claims that are clearly excluded under a policy, so "[b]ecause undisputed facts establish that there was no actual or potential coverage for Blue Isle's claims under the Policy, [the insurer] did not fail to reasonably investigate those claims").

        i.      <u>No genuine issue of fact exists as to whether the Policy contains vague or ambiguous terms.</u>

As an initial matter, Plaintiff argues that "[t]he undefined terms in the Insurance Policies are ambiguous and Ms. Wills and Mr. Overstreet's attempt to define them, in comparison to [his] reasonable construction of them, requires these terms to be interpreted in favor of the insured."  Oppo. at 7:8-9, 24:1-4, 27:4-8, 28:20-27, 31:9-14.  Yet, Plaintiff does not state which terms in those exclusions are "vague" and "undefined."  Reply at 11:11-18.

The only specific term Plaintiff identifies as undefined, vague, and ambiguous is the term "servicing."  Oppo. at 8:22-9:1.  Under California law, "[t]he fact that a term is not defined in the policies does not make it ambiguous."  *Wellness Eatery La Jolla LLC v. Hanover Ins. Grp.*, 517 F. Supp. 3d 1096, 1102 (S.D. Cal. 2021) (Battaglia, J.) (quoting *Foster-Gardner, Ins. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998)).  Further, once a court interprets a term in an insurance policy in an analogous context, that term is not ambiguous.  *See O'Brien Sales & Mktg., Inc. v. Transportation Ins. Co.*, 512 F. Supp. 3d 1019, 1023 n.7 (N.D. Cal. 2021) (holding that "if a term in an insurance policy" is used in an analogous context and previously "has been judicially construed, it is not ambiguous") (quoting *Lockheed Martin Corp. v. Cont'l Ins. Co.*, 134 Cal. App. 4th 187, 197 (2005)).

Cases have interpreted policies containing similar exclusions meaning that because those exclusions have been judicially construed, they are not ambiguous as a matter of law. *See O'Brien*, 512 F. Supp. 3d at 1023 n.7; *Lakeland*, 727 F. Supp. 2d at 891.   Thus, the Court concludes that the terms of the Policy are neither vague nor ambiguous and rejects Plaintiff's arguments to the contrary.

ii.   <u>Exclusion 1(j) bars coverage for losses arising from repairs, preventing coverage for the First Claim.</u>

Exclusion 1(j) excludes from coverage any "loss" that is "directly and immediately caused by . . . repairing, renovating, servicing, or maintenance" of the Vessel.   Policy at 36-37; Compl. at 9, ¶ 28.   Previously, this Court denied Defendant's Motion to Dismiss based on this exclusion, finding that the Complaint alleged the "damage to the Vessel did *not* occur while the Vessel was being repaired, renovated, serviced or while maintenance was being performed" as "[a]ll of those activities are performed *out-of-the-water.*"   Order, ECF No. 6 at 11:4-7 (citing Compl. at 9, ¶ 31).   Thus, it concluded that the Complaint sufficiently alleged the damage to the Vessel did not qualify as a direct and immediate result of servicing "assuming the facts as alleged are true."   *Id.* at 6:11:7-9.

On summary judgment, however, the evidence before this Court is that a sea-trial is an integral part of the repair and servicing of a vessel.   Mot. at 25:2-4 (citing Ex. 1 to Stargardter Decl., March 9, 2021 Deposition Transcript of Harold L. Hainsworth, Jr., ECF No. 23-3 at 10-11, 29:16-30:7 (testifying that the purpose of a sea trial is "like . . . a test drive after you work on a car, basically, to test everything," which was why he "had the boat out in the open water" as he was "testing the repairs that had been made to the vessel," including the repairs to the engine).   Thus, Defendant contends that this exclusion "eliminates coverage for the damage caused by the allision."   Mot. at 25:4-5.   Plaintiff opposes by arguing that "[n]either repairs nor servicing of the boat were taking place when the boat was crashed into a dock while being operated in the Pacific Ocean."   Oppo. at 23:11-13 (citing Cherewick Decl., at 14, ¶ 45).   However, as outlined below, this argument fails because as Mr. Hainsworth testified, just as a test drive is part of the auto repair

-32-

process, a sea trial is equally a part of the boat repair process.

The Court is unaware of any binding, or even nonbinding, precedent addressing whether a sea trial—or even a car mechanic's test drive—falls under a repair exclusion for an insurance policy covering a boat or vehicle.  Although Plaintiff argues that when the Vessel was damaged, it was sailing the navigable waters of the Pacific Ocean and was not being repaired in that exact instant,[13] the Court finds this argument unpersuasive.  For instance, in *Reynolds v. Ingalls Shipbuilding Div., Litton Sys., Inc.*, 788 F.2d 264, 267 (5th Cir. 1986), *cert. denied*, 479 U.S. 885 (1986), the Fifth Circuit held that "a ship undergoing sea trials is not 'in navigation' for purposes of the Jones Act" because "a ship engaged in sea trials makes no warranty of seaworthiness; the ship is undergoing trials precisely to determine what, if any, additional work needs to be done."  This Court, like the *Reynolds* court, agrees that the Vessel was not "in navigation" but rather was "undergoing trials precisely to determine what, if any, additional work need[ed] to be done."  Such an evaluation, like the test drive of a vehicle to evaluate whether additional repairs need to be performed, is part of the repair process.  Additionally, a Florida statute defines a "sea trial" as "a voyage ***for the purpose of testing repair*** or modification ***work***, which is in length and scope reasonably necessary to test repairs or modifications, or a voyage for the purpose of ascertaining the seaworthiness of a vessel."  Fla. Stat. § 212.02(25).  Similarly, in this case, Mr. Hainsworth testified that the purpose of the sea trial was to "test[ ] the repairs that had been made to the [V]essel" and determine whether "any additional repairs need[ed] to be made to the [V]essel."  *See* Hainsworth Dep. at 10-11, 29:16-30:1-7; 15, 36:9-17; 22, 82:13-18.  Plaintiff has failed to point the Court to any evidence refuting Mr. Hainsworth's testimony that the purpose of the sea trial was to see whether additional repairs needed to be made.  Rather, when the damage occurred, the Vessel was still in OMC's possession,

---

[13]    Plaintiff argues that "[s]ervicing does <u>not</u> equate with a 'sea trial' or 'test drive' where an accident occurs."  Oppo. at 8:28-9:1.

care, custody, and control for repairs.[14]

Thus, although the Court previously denied Defendant's Motion to Dismiss under this exclusion, the Court is no longer required to accept as true Plaintiff's allegation that "the damage to the Vessel did <u>not</u> occur while the Vessel was being repaired, renovated, serviced or while maintenance was being performed." Compl. at 9, ¶ 31. Rather, the evidence on summary judgment shows that (1) on November 18, 2015, OMC informed Plaintiff that the Vessel was damaged from the allision during a sea trial, *see* Exhibit 3 to Stargardter Decl., ECF No. 23-4 at 8; (2) Plaintiff admits the damage to the Vessel arose during a sea trial, *see* Exhibit 12 to Exhibit 5 to Stargardter Decl., ECF No. 23-8 at 5; and (3) both of Plaintiff's claims ultimately pertain to damage from the allision. *See* Exhibit 6 to the Declaration of Doug Overstreet in Support of Defendant's Motion, ECF No. 23-12 at 2-8 (attaching the insurance claim file). Consequently, the Court concludes that Defendant is entitled to judgment as a matter of law in light of the evidence as well as the Court's conclusion that a sea trial is part of the repair process. *See, e.g.*, Suja A. Thomas, *The New Summary Judgment Motion: The Motion to Dismiss Under Iqbal and Twombly*, 14 Lewis & Clark L. Rev. 15, 28-29 (2010) ("The facts before a court under summary judgment include information outside of the complaint presented by both parties, in contrast to the facts before the court under the motion to dismiss, which includes

---

[14]     The policy reasons behind such a repair exclusion are the same reason Ms. Willis recommended to Plaintiff "that he should discuss coverage possibly with the liability policy of the shop." *See* ECF No. 23-12 at 8. Most repair businesses have commercial general liability policies that would cover damage to property in the business' possession due to its own negligence. This is the exact reason most boatowners policy have an exclusion exempting from coverage any damage that may arise while the boat is under repair (*i.e.*, because the repair facility will likely have insurance that would cover any such damage). However, it is of no concern to this Court whether OMC had a commercial general liability insurance policy that did or did not provide coverage to Plaintiff for the damages he seeks in this case. *See, e.g.*, Fed. R. Evid. 411 ("Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully."). All that matters is that the Policy contained an exclusion, which encompassed the damage to the Vessel claimed in both of Plaintiff's claims.

1   only facts in the complaint.").

2        Although the Court suspects it could cease its analysis based upon its conclusion that

3   Plaintiff's damages for the First Claim arose during repairs, it continues analyzing the other

4   exclusions because Plaintiff also seeks damages for his Second Claim, which seeks

5   reimbursement for damages still ultimately attributable to the allision but which worsened

6   after the initial date of loss.  Ultimately, the Court finds that even if Plaintiff's damages did

7   not qualify as repairs, they would still be excluded under other Policy exclusions.

8            b.   ***Defendant's denial of the Second Claim[15] did not breach the***

9                 ***contract***

10        The parties dispute whether Plaintiff's damages under the First Claim and the

11  Second Claim were also wrongfully denied under the exclusions of the Policy.  As outlined

12  below, the Court finds that whether Plaintiff's damages arise from the sea trial or any of

13  the other alleged attributable causes, no genuine issue of fact exists as to whether the

14  damages fall under numerous policy exclusions.

15            i.   Exclusion 1(a) bars coverage for wear, tear, deterioration,
                   and marring.

16        Exclusion 1(a) excludes coverage for any loss "directly and immediately caused by

17  "wear, tear, marring, scratching, denting, deterioration, inherent vice, latent defect,

18  mechanical breakdown, corrosion, electrolysis."   Policy at 36-37; Compl. at 9, ¶ 28.

19  Previously, Defendant argued that Plaintiff's loss was excluded under Exclusion 1(a)

20  because the damage to the Vessel was caused by "sitting unattended for 2 and ½ years,"

21  which falls under Exclusion 1(a).  ECF No. 2-1 at 17:1-6.  However, the Court found that

22  because the Complaint alleged the loss occurred due to negligent operation during a sea-

23  trial (instead of sitting unattended), a loss due to wear and tear from sitting in storage would

24

25  _____

26  [15]     Although the Court already found no genuine issue of fact exists as to the lack of
    coverage of the First Claim under Exclusion 1(j) and focuses this section on the Second

27  Claim, because the Second Claim for "additional damages from the original claim," *see*
    ECF No. 23-14 at 3, requires the Court to analyze additional Policy exclusions, the Court

28  addresses whether those exclusions would also bar the First Claim as well.

not preclude coverage.  Order, ECF No. 6 at 12:18-23.  On summary judgment, Defendant advances a different argument: It contends that "marring" is defined as "to inflict damage, especially disfiguring damage, on" or "a disfiguring mark or blemish."  Mot. at 25:9-11.  Consequently, because the allision with the cement piling marred and scratched the Vessel, Exclusion 1(a) precludes coverage for the damage to the Vessel from the allision.  *Id.* at 25:11-14.  Plaintiff responds that this exclusion does not bar coverage because "the damage to the Vessel is far more severe than a mark or blemish—among other things, the bow is disconnected from the hull as discussed in the Lou Mencuccini report."  Oppo. at 23:14-16 (citing Cherewick Decl. at 14, ¶ 46).  Defendant replies that "[a]ll coverage for these claims is excluded, as a matter of law" because Plaintiff's "photos and invoices confirm that much of the claimed damage is due to wear, tear, marring and scratching of the Vessel due to normal use, and deterioration, and corrosion."[16]  Reply at 12:1-5.

As to whether Plaintiff's damages fall within Exclusion 1(a) due to "marring," the Court finds that the term "marring" is neither vague nor ambiguous.  The California

---

[16]    The Court notes that the Complaint attaches various photographs as Exhibit D to Exhibit 7 of the Complaint, which are meant to evidence the damage to the Vessel.  *See* Compl. at 10, ¶ 36.  First, the Court finds such photographs irrelevant given its ruling is based on the fact that it concludes that regardless of the extent of the damage and/or when it became apparent, the damage is excluded because it occurred during the repair process.  Second, even if the Court found such photographs relevant, it would be inappropriate to consider them given the Complaint fails to explain who took the photographs and when, meaning they have not been properly authenticated and no foundation exists for the Court to consider them.  *See* FED. R. EVID. 901.  Similarly, Defendant's Motion for Summary Judgment attaches Plaintiff's Initial Disclosures as Exhibit 5 to the Declaration of GailAnn Y. Stargardter.  *See* ECF No. 23-7 at 2-71.  However, as with the photographs attached to the Complaint, Plaintiff's Initial Disclosures merely attach the photographs without providing any information as to who took the photographs and when.  *See* ECF No. 23-7 at 4:9-21.  Thus, these photographs are also not properly authenticated.  Plaintiff's Declaration attached to his Opposition states that he inspected the Vessel in September 2018, learned of the damage, and that Exhibits 5, 6, and 7 accurately depict the various damages he describes.  Cherewick Decl. at 6-7, ¶ 26.  However, this Declaration also does not indicate whether he or someone else took the photographs, and on what date(s) the photographs were taken.  *See id.*  Thus, the Court did not consider the photographs when ruling on this Motion.

Insurance Law Dictionary states that "[t]he general dictionary definition of the verb 'to mar' includes to 'inflict damage, especially disfiguring damage.'" Cornblum, Bruce, 2 California Ins. Law Dictionary & Desk Ref. § M20 MARRING, (2021 ed., July 2021 Update). It explains that "[g]iven the context of the word in the policy, adjacent to the terms 'wear and tear' and 'deterioration,' the term is meant to include that marring of appearance caused by wear and tear or deterioration resulting from the reasonable and normal use of an object over time." *Id.* (citing *Ehsan v. Ericson Agency, Inc.*, No. cv-010085772S, 2003 WL 21716345, at *15 n.18 (Conn. Super. Ct. 2003) (Unpublished). The Court agrees with Plaintiff that even under Defendant's new argument that Plaintiff's damage is excluded because it qualifies as marring or scratching of the exterior from the allision, Plaintiff's damages would not fall under Exclusion 1(a) given the facts indicate the damage to hull of the Vessel was more severe than a simple scratch, dent, or marring. However, to the extent any damages Plaintiff seeks arise from deterioration of the Vessel during the two years he kept it in storage and out of water, such claims fall under Exclusion 1(a). *See, e.g.*, *Grebow v. Mercury Ins. Co.*, 241 Cal. App. 4th 564, 575 (2015), *as modified on denial of reh'g* (Oct. 26, 2015) (holding that "the policy excludes losses caused by wear and tear and deterioration, rust, or corrosion" because "[t]he parties could not possibly have intended that Mercury insured for deterioration or wear and tear thus converting their homeowners insurance policy into a maintenance agreement").

For instance, in *Brodkin v. State Farm Fire & Cas. Co.*, the court affirmed a grant of summary judgment in favor of the defendant-insurer, holding that the plaintiff-insureds' claim for corrosion of the foundation of their home due to soil contamination was not a covered peril under their "all-risk" homeowners insurance policy. 217 Cal. App. 3d at 213. The *Brodkin* policy was also a State Farm policy that contained the same exclusions in this case—Exclusions 1, 2, and 3, which contained similar, and in some cases, identical language to the Policy in this case. *See id.* at 214-15. The court rejected the plaintiffs' argument that the defendant "failed to prove the loss was excluded under the policy terms because there was no evidence as to the cause of the loss, and the proximate cause of the

loss, corrosive soils, was not excluded." *Id.* at 216.  Even though the parties disagreed over "the efficient proximate cause of the loss," "summary judgment [was] still proper if all of the alleged causes of the loss are excluded under the policy." *Id.* at 217.  The three potential causes of the cracking and corrosion of the foundation in *Brodkin* were (1) earth movement, which fell under an exclusion for "shifting . . . of the earth"; (2) corrosives in the soil, which fell under an exclusion for "deterioration" and "contamination"; or (3) negligent construction, which fell under an exclusion for any "defect, weakness, inadequacy, fault or unsoundness in … design, specifications, workmanship, construction grading, or compaction." *Id.* at 217-18.

This Court previously found, when ruling on Defendant's Motion to Dismiss, that "*Brodkin* [is] inapplicable to the present case because not all of Plaintiff's alleged loss is excluded under the policy, and questions of fact remain."  Order, ECF No. 6 at 10:9-11.  On summary judgment, the Court finds that that the parties have been given the opportunity to partake in discovery, so its decision differs, primarily because (1) Defendant's argument is different (*i.e.*, that the damage arose from marring rather than sitting unattended) and (2) Defendant provides the Court with evidence that the damages claimed in this case arise due to either repairs or wear, tear, deterioration, or marring.  For instance, Defendant's evidence shows that both of Plaintiff's claims ultimately pertain to damage from the allision.  *See* Exhibit 6 to the Declaration of Doug Overstreet in Support of Defendant's Motion, ECF No. 23-12 at 2-8 (attaching the insurance claim file).  This evidence, which had previously been unavailable to the Court as the exhibits supporting those facts were attached to Defendant's Motion but had not been attached to Plaintiff's original Complaint, indicates that as in, *Brodkin*, all of Plaintiff's claimed losses fall under one exclusion or another within the Policy.  217 Cal. App. 3d at 217.  Thus, even though Plaintiff attached the Policy to his Complaint, and the Court considered the same Policy provisions it considers now when ruling on Defendant's previous motion to dismiss, the Court's decision now grants summary judgment, in part, because the undisputed evidence shows that "the damage resulted from a [s]ea-trial attempt."  Oppo. at 16:27-17:12.  This damage

included marring, which as to the First Claim, in addition to being barred under Exclusion 1(j) for repairs, is also barred by the marring provision under Exclusion 1(a).

As to whether Plaintiff's damages for the First Claim also fall within Exclusion 1(a) because they resulted from "mechanical breakdown," the Court notes that Mr. Hainsworth testified at this deposition that "having been there at the time when it happened," his understanding is that the allision was caused by "[t]he electronic control malfunction[ing]." Exhibit 1 to Stargardter Decl., ECF No. 23-3 at 20, 74:12-14.  He described how he had both engines in forward gear and pulled back to reverse, but when he did, the port engine stayed forward. *Id.* at 20, 74:15-18.  If the allision was caused by "mechanical breakdown," then, Exclusion 1(a) also excludes from coverage any damage resulting from the allision. *See* ECF No. 1-2 at 36-37.  Plaintiff's own expert, Mr. Mencuccini, submitted a Declaration in Support of Plaintiff's Opposition, *see* ECF No. 24-2 at 1-7, which attached as Exhibit 1 his January 14, 2020 Report on his January 8, 2020 inspection of the Vessel, *see* ECF No. 24-2 at 9-12.   Neither his declaration nor report offer any evidence to rebut Mr. Hainsworth's testimony that a "mechanical breakdown" caused the allision.

Finally, as to whether Exclusion 1(a) bars coverage for Plaintiff's damages for the Second Claim because they arose from "wear and tear," Plaintiff argues again, that "crashing the Vessel into a dock while being operated in the Pacific Ocean[,] which resulted in[, among other things, the bow being disconnected from the hull of the Vessel[,] has nothing to [do] with ordinary wear and tear."  Oppo. at 23:20-23 (citing Cherewick Decl. at 14, ¶ 48).  However, the February 14, 2019 Report from Mr. Trenkle[17] points out that Plaintiff claims damages to the rub rail on the portside of the Vessel, but Mr.

---

[17]    While the Court may consider expert opinions with respect to facts, it must ignore them with respect to the ultimate issues requiring a legal determination by the Court.  *See KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 426-27 (2007).  Thus, expert opinions on legal conclusions may not defeat summary judgment.  *See id.*; *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) (holding "broad conclusory statements offered by Telemac's experts are not evidence and are not sufficient to establish a genuine issue of material fact").

Hainsworth stated that he was "100% certain he did not damage the port upper rub rail," and "[t]his damage [was] not consistent with an allision with a concrete piling with the bow, or a dock and more likely occurred while the vessel was stored on its trailer for 2 ½ years at a dirty and disorganized towing yard, or when being to, or located at the Boat Grotto for maintenance."  ECF No. 24-3 at 168.  He also opined that "[i]t appears that the [insured] suffered some damages to the vessel that were not repaired correctly by Oceanside Marine Center, however the bulk of his problems appear to be due to the vessel sitting far 2 ½ years unattended on a tailer in a dirty and disorganized towing yard."  *Id.* at 169.  Despite Plaintiff's expert, Mr. Mencuccini, starting in his report that "[t]he subject vessel was stored on a trailer and according to [Plaintiff] had not been in the water for 'quite some time,'" *see* ECF No. 24-2 at 9, nowhere in his Declaration or Report does he address Mr. Trenkle's conclusions that some of the damage was caused by the Vehicle being stored for two and a half years, *see generally* ECF No. 24-2.  Other than Plaintiff's legal arguments and conclusions, he has failed to direct the Court to evidence in the record from which a reasonable jury could conclude that no portion of Plaintiff's damages for the Second Claim are attributable to "wear and tear" or neglect of the Vessel by allowing sitting unattended to for two and a half years.  *See Oracle*, 627 F.3d at 387.  Nonetheless, as in *Brodkin*, it is of no consequence whether Plaintiff's damages arose from the sea-trial, deterioration, normal wear and tear of the Vessel, or Plaintiff's failure to maintain the Vessel during the two years he kept it in storage.  217 Cal. App. 3d at 216-17.  Like the *Brodkin* court, this Court finds that under any or all of the aforementioned potential causes, Plaintiff's claims are excluded under the plain meaning of Exclusion 1(a).  *See id.*

In sum, like the *Brodkin* court, this Court concludes it need not make a specific finding as to whether Plaintiff's damages arise from a cause falling under Exclusion 1(a) because those damages are either excluded under Exclusion 1(j), for repairs, or Exclusion 1(a), for mechanical breakdown, marring, wear, tear, and/or deterioration.  Either way, there is no genuine issue of fact that all of those causes are excluded under the Policy.

/ / /

ii.   Exclusions 3(a) and (b) bar coverage for inadequate maintenance of defects in repair work

Exclusion 3 excludes from coverage any loss "directly and immediately caused" by "repairing" the Vessel **even if** "*indirectly cause[d]*" **by** (a) "conduct, act[s], failure to act, or *decision[s] of any person* . . . whether intentional, wrongful, negligent, or *without fault*" or (b) "defect[s], weakness[es], *inadequacy*, fault[,] or unsoundness *in*: (1) design, specifications, *workmanship*, construction; (2) *materials used in* construction or *repair*; or (3) *maintenance*." Policy at 36-37 (emphasis added). Previously, this Court found that because "the allegations that much of the loss to the Plaintiff's vessel occurred during the sea trial when it struck a cement piling [were] plausible," then, "assuming the allegations are true, Plaintiff's claim is not barred in its entirety due to loss from improper repairs." Order, ECF No. 6 at 11:20-12:17. As stated above, now the Court finds that Plaintiff's claims are barred by either repairs themselves or inadequacy of repairs, resulting in the mechanical breakdown that may have contributed to or even caused the allision.

On summary judgment, Defendant argues that Exclusions 3(a) and 3(b) have been upheld by other courts, and these exclusions exclude coverage for his claims because Plaintiff contends that "OMC's repairs [or materials used in the repairs] of the allision damage were defective, faulty, and inadequate." Mot. at 26:7-14. Plaintiff responds that "crashing the Vessel into a dock while being operated in the Pacific Ocean … has nothing to [do] with workmanship or materials used in repairs." Oppo. at 23:17-20 (citing Cherewick Decl. at 14, ¶¶ 47, 49). Defendant replies by reiterating that because "Exclusions 3.a., 3.b.(1) and 3.b.(2) … have been upheld by numerous California courts," as a matter of law, they preclude coverage for Plaintiff's claims for OMC's negligent work in repairing (workmanship and materials) the damage it caused to his Vessel while performing the actual repairs Plaintiff hired it to perform. Reply at 12:11-120 (citing *Cuevas v. Allstate Ins. Co.*, 872 F. Supp. 737, 739 (S.D. Cal. 1994) (Brewster, J.); *Brodkin*, 217 Cal. App. 3d at 217-18; *Waldsmith*, 232 Cal. App. 3d at 696; *Wilson v. Farmers Ins. Exch.*, 102 Cal. App. 4th 1171, 1176 (2002)).

Numerous cases have upheld the same exclusion as barring coverage where claimed damage relates to negligent workmanship.  *See, e.g.*, *Brodkin*, 217 Cal. App. 3d at 217-18 ("If the proximate cause of the damage is attributable to negligent construction, the claim is barred under that part of the policy which excludes claims for any 'defect, weakness, inadequacy, fault or unsoundness in ... design, specifications, workmanship, construction, grading, [or] compaction," which "is clear and unambiguous and expressly covers the damage claimed here"); *Wilson*, 102 Cal. App. 4th at 1177 ("Because the loss plaintiffs claimed fell within the scope of the 'inadequate renovation' exclusion as a matter of law, the trial court properly granted summary judgment in favor of Farmers."); *Cuevas*, 872 F. Supp. at 739 (finding "that exclusion 7(a) unambiguously excludes '[c]onduct, act, failure to act .. of any person . . . whether intentional, wrongful, negligent, or without fault' whenever the act/omission is combined with another cause of loss excluded under the policy—in this case, water damage") (applying California law); *Waldsmith*, 232 Cal. App. 3d at 696-97 (finding no coverage under the policy where "[n]either the ultimate cause of the loss (landslide) nor the stipulated efficient proximate cause (negligent maintenance by the city) was a covered peril" as "negligent maintenance of the water main appears to fall squarely under the exclusions contained in paragraph 3, i.e., … inadequacy in workmanship, materials used in repair, or 'maintenance of any property'").

Having concluded that that a sea-trial is part of the repair process, the Court finds that Exclusions 3(a) and 3(b)(3) also bar coverage for Plaintiff's losses because the loss is "directly and immediately caused" by "repairing" the Vessel and indirectly caused by both the (a) negligent conduct of a person—namely, Mr. Hainsworth—and (b) "defect[s], weakness[es], inadequacy, fault[,] or unsoundness in: (1) design, specifications, workmanship, construction; (2) materials used in construction or repair; or (3) maintenance." ECF No. 1-2 at 36-37.  Thus, Exclusions 3(a) and 3(b) barred coverage for both the First Claim and the Second Claim, to the extent the losses arise from inadequate repairs or workmanship in attempting to remedy the damage from the allision, meaning Defendant did not breach the contract by denying coverage.

-42-

iii.    Exclusion 2(b) bars coverage for failing to properly preserve property after a loss

Exclusion 2(b) bars coverage when the insured fails to properly preserve property after a loss.  Policy at 36.  Defendant argues that Exclusion 2(b) precludes coverage due to "[t]he extent [Plaintiff] failed to take steps to repair the [Vessel] after [1] being informed of the allision and that fairly significant damage had occurred or [2] determining the repairs made by OMC were faulty."  Mot. at 27:23-28:5 (citing *Tuchman v. Aetna Cas. & Sur. Co.*, 44 Cal. App. 4th 1607, 1611 (1996)).  Plaintiff responds that this "exclusion has no application here because the Vessel has at all times been properly stored."  Oppo. at 23:26-28 (citing Cherewick Decl. at 15, ¶ 50).  Defendant replies that "Exclusion 2.b. precludes coverage for [Plaintiff]'s neglect to protect the vessel from further damage, at or after the time of loss."  Reply at 12:6-7.

Exclusion 2(b) states that Defendant will "not insure under any coverage for any loss which would not have occurred in the absence of …. neglect of the insured to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered" "regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss."   Policy at 36.

In *Tuchman v. Aetna Cas. & Sur. Co.*, the California Court of Appeal held that the trial court erred in applying a similar neglect exclusion applied as a matter of law to bar the plaintiffs' claims to the facts presented.  44 Cal. App. 4th at 1610-12.  However, the *Tuchman* court was primarily focused on whether the exclusion pertained to neglect before or after the loss.  *Id.* at 1612.  The *Tuckman* claim, which the carrier denied on the basis of a similar neglect exclusion, arose after the carrier denied the plaintiffs' claim under their homeowners insurance policy for the value of their furniture, which had been stolen.  *Id.* at 1611.  The court held that "[n]eglect of the insured which creates a situation from which theft may more easily be effectuated is not, by itself, a readily identifiable, imminent and real peril which falls within exclusion 5."  *Id.* at 1616.  However, it interpreted the language

-43-

of the exclusion to "mean[ ] that the insured must have knowledge of a readily identifiable, imminent, and real peril, endangering the property." *Id.* It also interpreted the language to mean that pre-loss neglect did not fall within the exclusion. *Id.* Because the focus at trial had been on pre-loss neglect, which did not fall under the exclusion, rather than post-loss neglect, which would fall under the exclusion, whether the plaintiffs "abandoned" the property after the loss had not been "decided by the trial court." *Id.* at 1616-17. Thus, the court reversed the trial court's entry of judgment in the insurer's favor and remanded for further proceedings. *Id.* at 1610-12. That being said, the court noted that it had "no doubt that exclusion 5 contemplate[d] abandonment as an exclusion where the insured fails to exercise due care 'at and after the time of a loss, or when property is endangered by a peril insured against." *Id.* at 1616-17.

Similar to the Court's conclusion that under *Brodkin*, any damages due to deterioration of the Vessel fall within Exclusion 1(a)'s exclusion for loss due to deterioration, 217 Cal. App. 3d at 216-17, under *Tuchman*, any post-loss damages due to Plaintiff's neglect in maintaining the Vessel during the more than two years he kept it in storage fall within Exclusion 2(b) for neglect of the insured to preserve the property after the loss even if the actual cause of the loss is not known. 44 Cal. App. 4th at 1616-17. In ruling on Defendant's Motion to Dismiss, the Court previously held that "the Complaint alleges facts plausibly showing Plaintiff did not discover damage to the vessel until September 2018 due to OMC's concealment and/or misrepresentations." Order, ECF No. 6 at 13:5-7. Thus, assuming the facts alleged in the complaint were true, "Plaintiff would not have knowledge of a readily identifiable, imminent, and real peril, endangering the vessel, as is required for this exclusion," so at the pleading "stage of the litigation, the neglect exclusion [did] not bar Plaintiff's claim in its entirety." *Id.* at 13:7-10. At summary judgment, the Court concludes that the undisputed facts indicate that regardless of whether Plaintiff knew the extent of the damage, leaving a yacht for storage in two years does not qualify as proper maintenance of the Vessel. Thus, to the extent any of Plaintiff's damages arise from neglect of the Vessel following the allision, those damages fall under Exclusion

2(b) for neglect of the insured to preserve the property.

iv.  Exclusion 3(b)(3) bars coverage for inadequate maintenance

As stated, Exclusion 3(b)(3) bar excludes from coverage any loss "directly and immediately caused" by "repairing" the Vessel even if "indirectly cause[d]" by "defect[s], weakness[es], inadequacy, fault[,] or unsoundness in . . . .  maintenance."  Policy at 36-37. Defendant argues that "[i]nvoices submitted by [Plaintiff] pre-suit and obtained through discovery show that repair work was performed because of bad gasoline in the engines due to the vessel being [unused] for 2 years; for service to the trailer due to it being stored for an extended period of time; and for the replacement of 'old' equipment and component parts."  Mot. at 27:9-22 (citing Exhibit 5 to the Stargardter Decl., ECF No. 23-7 at 72, RC 000081; Exhibit B to Plaintiff's Complaint, ECF No. 1-2 at 111-14, ECF No. 1-3 at 1-2). Thus, Defendant argues that this evidence shows that any amounts relating to these claimed damages are "for normal wear and tear and lack of or deferred maintenance," meaning they are not covered by the Policy.  Mot. at 27:21-22.

Exhibit B to Exhibit 7 of Plaintiff's Complaint, ECF No. 1-2 at 111-14, ECF No. 1-3 at 1-2, shows repairs performed by Harbor Helper, Inc. included removing and replacing old batteries, battery charger buss bars and power leads, terminal ends on all charging wires, fuse holders on all charging wires, corroded battery lugs, and the corroded shift/throttle cable from control to kicker motor on July 2, 2018.  ECF No. 1-2 at 114.  On August 23, 2018, Harbor Helper, Inc. also removed old plumbing for the air conditioning pump and installed new hoses and clamps for the air conditioning.  *Id.* at 111.  On September 13, 2018, The Boat Grotto also billed Plaintiff for a check-up on the engine because the "boat ha[d] bad gas and [had] not been run in 2 years."  ECF No. 1-3 at 7. Another invoice from The Boat Grotto, dated September 18, 2018, shows repairs for checking the brake fluid in the actuator and sanding primer front rust off the actuator.  ECF No. 1-3 at 13.  This evidence bolsters Mr. Trenkle's opinions that at least some of Plaintiff's damages are attributable to the Vessel being left unattended for two and a half years.  *See*

ECF No. 24-3 at 168-69.  Plaintiff offers no contrary evidence showing how any of his damages are not at least partially attributable to his inadequate maintenance.

Thus, the unrebutted evidence indicates at least some of Plaintiff's damages, especially as relates to the Second Claim, are attributable to inadequate maintenance, falling under Exclusion 3(b)(3) of the Policy.

### v.   Exclusion 3's "give back" provision does not restore coverage

Defendant argues that the "give back" provision in the Policy does not apply to give coverage back to Plaintiff.  Mot. at 28:6-17.  The Policy contains an exception to Exclusion 3, which states that Defendant will "insure for any resulting loss from [Exclusions 3] a. and b. *unless* the resulting loss is itself a Loss Not Insured by this Section."  Policy at 36-37.

In *Brodkin*, the plaintiff-homeowners "argue[d] that under the 'ensuing loss' clause the claim is covered because the *cause* of the damage was not excluded."  *Id.* at 218.  Again, *Brodkin* involved a similar State Farm policy which provided that the defendant similarly "do[es] insure for any ensuing loss ... unless the loss is itself a Loss Not Insured by this Section."  *Id.*  The court noted that "[i]t is not the intent of this section to enlarge the items which are covered under the policy."  *Id.*  Thus, where a court determines "that the loss is excluded under the terms of the policy, it is clear the ensuing loss clause does not provide coverage of this claim."  *Id.*

Plaintiff does not address this "give back" provision, but the Court finds that any resulting losses from the allision would still not provide Plaintiff with coverage.  *Brodkin*, 44 Cal. App. 4th at 218.  Thus, Plaintiff finds no relief from the exclusions barring coverage for his claims under Exclusion 3's "give back" provision.

### vi.   Conclusion

The Court finds this case akin to a case from the Eleventh Circuit.  In *Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Cont. No. B0621MASRSWV15BND*, the Eleventh Circuit affirmed the district court's decision granting summary judgment in favor of the defendant-insurer and

defendant-boatyard where the plaintiff-owner of a yacht that became partially submerged while at a boatyard for repairs sued for the loss. 766 F. App'x 795, 796-97 (11th Cir. 2019). Like Defendant, the *Kol B'Seder* insurer insured the plaintiff's yacht against accidental losses. *Id.* at 797. During the eight years leading up to the loss, the vessel, like Plaintiff's Vessel, had suffered engine troubles that required years to fix and underwent major repairs to the rudder and hull. 766 F. App'x at 797. It also experienced electrical problems with the generator and batteries. *Id.* When the plaintiff called about bringing the vessel in for repairs on a Friday, he was told that he could do so, but the boatyard would probably be unable to haul the vessel out of the water until Monday. *Id.* Despite this warning, Plaintiff brought the vessel in that day and "did not inform [the boatyard] that the boat had not received bottom maintenance in more than three years." *Id.* On Sunday, a boatyard employee discovered that the vessel had become partially submerged but took measures to haul the vessel out of the water and preserve it. *Id.* After learning of the loss, the plaintiff submitted an insurance claim to his carrier. *Id.* However, the policy, like the Policy in this case, contained an exclusion for "'wear and tear, gradual deterioration, osmosis, wet or dry rot, corrosion,' 'defects in design,' and 'any claims caused by or arising out of … lack of repair of [the vessel] caused by the lack of reasonable care and due diligence in the … maintenance of [the vessel]." *Id.* Like Plaintiff, the plaintiff sued the insurer for breach of contract after it denied his claim based on a finding that "the submersion resulted from design and installation defects along with [the plaintiff]'s failure to do preventative maintenance, causes that fell within the policy's exclusions." *Id.* at 798.

In affirming the district court's decision granting summary judgment in the insurer's favor, the court noted that "[b]reach is a necessary element to prevail on a breach of contract claim." However, even though the policy covered accidental losses, the court "discern[ed] no genuine dispute over the cause of [the vessel]'s submersion—that it was not an accident but rather design and installation defects and [the plaintiff]'s failure to maintain the vessel properly." *Kol B'Seder*, 766 F. App'x at 800. Thus, the insurer's "refusal to pay out [the plaintiff]'s insurance claim did not breach the contract, and [the

plaintiff]'s claim fails as a matter of law." *Id.* "Given the complete lack of evidence disputing that these issues [*i.e.*, the issues described in the applicable exclusions] caused the submersion, for this additional reason," the court held the insurer did not breach the contract, causing the plaintiff's claims to fail as a matter of law. *Id.*

"[E]ven where the parties may disagree over the factual question of proximate cause, summary judgment is still proper if all of the alleged causes of the loss are excluded under the policy." *Brodkin*, 217 Cal. App. 3d at 217. Like the *Kol B'Seder*, Plaintiff does not dispute that his losses are not covered by the Policy *if they resulted* from, *inter alia*, repairs, inadequate maintenance, normal wear and tear, deterioration. 766 F. App'x at 797-99 n.2. All evidence indicates the damage to the Vessel occurred during the sea-trial, which Plaintiff does not dispute. Plaintiff merely disputes *the fact that his losses resulted from* repairs because he disputes whether a sea-trial is part of the repair process. Because the Court concludes that a sea-trial is, in fact, part of the repair process, it finds Plaintiff's damages fall within the exclusion for repairs under the Policy. As a result, Defendant did not breach the contract (*i.e.*, the Policy) by denying coverage for Plaintiff's losses. As in *Kol B'Seder*, Plaintiff's Policy covers certain accidental losses, but no genuine dispute over the cause of the Vessel's damages exists in this case. 766 F. App'x at 800. The efficient proximate cause of the allision was mechanical breakdown, which manifested during a sea trial, which is part of the repair process, and any additional damages giving rise to the Second Claim resulted from inadequate maintenance, normal wear and tear, or neglect. Given the complete lack of evidence disputing these issues—all of which fall under an exclusion—caused Plaintiff's damages, Defendant's refusal to pay Plaintiff's insurance claim did not breach the insurance contract as a matter of law. *See id.*

Thus, Defendant's Motion for Summary Judgment as to Plaintiff's Breach of Contract Claim is **GRANTED** because no genuine issue of fact exists as to whether Defendant breached the Policy (it did not) by denying Plaintiff's First Claim or Second Claim, meaning that no reasonable jury could find in Plaintiff's favor on his breach of contract claim.

**2.** _**Breach of the Implied Covenant of Good Faith and Fair Dealing (Bad Faith)**_

"[There] is an implied covenant of good faith and fair dealing in every contract [including insurance policies] that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." _Gruenberg v. Aetna Ins. Co._, 9 Cal. 3d 566, 573 (1973) (alterations in original) (quoting _Comunale v. Traders & Gen. Ins. Co._, 50 Cal. 2d 654, 658 (1958)). "For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it [ ] must give at least as much consideration to the [insured]'s interests as it does to its own." _Egan v. Mut. of Omaha Ins. Co._, 24 Cal. 3d 809, 818-19 (1979) (citing _Silberg v. Cal. Life Ins. Co._, 11 Cal. 3d 452, 460 (1974)). Thus, to state a claim for breach of the implied covenant of good faith and fair dealing in the denial of coverage context, which is sometimes referred to as a "bad faith claim," "the plaintiff must show that: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." _Align Tech., Inc. v. Fed. Ins. Co._, 673 F. Supp. 2d 957, 965 (N.D. Cal. 2009) (quoting _Love v. Fire Ins. Exch._, 271 Cal. App. 3d 1136, 1151 (1990)) (internal quotations omitted); _see also R & R Sails, Inc. v. Ins. Co. of State of Pennsylvania_, 610 F. Supp. 2d 1222, 1230 (S.D. Cal. 2009) (Anello, J.); _Major v. W. Home Ins. Co._, 169 Cal. App. 4th 1197, 1209 (2009) (quoting _Gruenberg_, 9 Cal. 3d at 573-74). This requires "Plaintiff [to] establish that Defendant's actions both breached the _contract and_ the actions, taken in bad faith, frustrated the actual benefits of the contract." _Martinez v. Infinity Ins. Co._, 714 F. Supp. 2d 1057, 1063 (C.D. Cal. 2010) (emphasis in original); _see also Airborne_, 2021 WL 1853602, at *9 ("[A]n insurer's bad judgment or negligence is insufficient to establish bad faith; instead, the insurer must engage in a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.")

On summary judgment, generally, "the reasonableness of an insurer's claims-handling conduct is a question of fact to be determined by a jury." _Airborne_, 2021 WL

1853602, at *9 (quoting *Chateau Chamberay*, 90 Cal. App. 4th at 346); *see also Principal Mut. Life Ins. Co.* 290 F.3d 1152, 1161–62 (9th Cir. 2002) ("[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably."). However, "when . . . reasonable minds could not differ" because there are no competing inferences, whether the insurer's claims-handling conduct qualifies as bad faith becomes a question of law. *Id.*

Courts have held that unreasonable conduct by an insurer qualifying as bad faith includes but is not limited to (1) failing to thoroughly investigate a claim; (2) interpreting policy terms in an unduly restrictive or arbitrary manner; (3) delaying the processing of a claim; and/or (4) purposefully delaying payment of a claim. *Airborne*, 2021 WL 1853602, at *12-13 (citing cases). The Complaint alleges that Defendant breached its duty of good faith and fair dealing by, *inter alia*, unreasonably failing to (1) conduct a diligent, thorough, and objective investigation of Plaintiff's claim and (2) provide Policy benefits to Plaintiff. Compl. at 13-14, ¶ 57(a)-(b). Although the Court's previous order determined that Plaintiff's Complaint had "sufficiently alleged unreasonableness to withstand a motion to dismiss," Order, ECF No. 6 at 15:14-15, the Court finds on summary judgment, that Defendant has shown the absence of evidence demonstrating a genuine issue of fact as to whether Defendant acted in bad faith or breached the implied covenant of good faith and fair dealing.

As to Plaintiff's allegations that Defendant breached the duty to defendant, "[i]t is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995), *as modified on denial of reh'g* (Oct. 26, 1995). With respect to the first element of a bad faith claim, or "benefits due under the policy," it is clear that "a bad faith claim cannot be maintained unless policy benefits are due." *Id.* This is because "[a]bsent that contractual right, ... the implied covenant has nothing upon which to act as a supplement, and should

not be endowed with an existence independent of its contractual underpinnings." *Id.* (quotation omitted). Thus, "[t]o succeed on a bad faith claim, the insured 'must first demonstrate that there is in fact coverage under the policy." *Airborne*, 2021 WL 1853602, at *8 (quoting *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1078 (2007), *as modified on denial of reh'g* (Apr. 20, 2007) (reasoning that "[i]If there is no coverage, then any failure by Allstate to properly investigate would not have caused Jordan any damage")). Here, because no coverage exists, there can be no bad faith claim. Further, because the issue of whether a sea trial qualifies as part of the repair process is an issue of first impression, the Court also finds that Defendant could not be liable for bad faith in declining a claim based on a novel issue.

As to the duty to investigate, "[a]n insurer's failure to investigate, upon which [the insured]'s claim of bad faith entirely rests, is *not* separately actionable if there is no coverage." *Airborne*, 2021 WL 1853602, at *8 (quoting *Jordan*, 148 Cal. App. 4th at 1078). "[I]f there is no coverage, there can be no bad faith in refusing coverage." *Sony Comput. Entm't Am., Inc. v. Am. Home Assurance Co.*, 532 F.3d 1007, 1021 (9th Cir. 2008) (citing *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1152-53 (1990)). Thus, there can be no breach of the duty to investigate here given the Court finds no coverage exists.

In sum, because the Court finds that no genuine issue of fact exists as to whether the Policy entitled Plaintiff to benefits (it did not), then, no genuine issue of fact exists as to whether Defendant breach its duty of good faith and fair dealing by acting in bad faith (it did not). *See, e.g.*, *Jihan, Inc. v. Amco Ins. Co.*, --- F. Supp. 3d ---, No. 3:20-cv-00097 TWR (WVG), 2021 WL 1963845, at *15 (S.D. Cal. May 17, 2021) (Robinson, J.) (holding that the defendant was "likewise entitled to summary judgment as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing" because the court had already "found that Amco [was] entitled to summary judgment as to Plaintiffs' claim for breach of contract," so "there [was] no genuine issue of material fact as to whether Amco 'withheld benefits due under the policy'"); *see also Blue Isle*, 2002 WL 34455175, at *9 (granting summary judgment in the defendant's favor because "[w]here no duty to

-51-

1    indemnify or defend exists under an insurance policy, no 'bad faith' exists as a matter of

2    law") (citing, *inter alia*, *Waller*, 11 Cal.4th at 35-36); *Coe v. Farmers New World Life Ins.*

3    *Co.*, 209 Cal. App. 3d 600, 608 (1989) (all tort claims against an insurer, including breach

4    of the implied covenant of good faith and fair dealing, "fall automatically" upon a

5    determination that the insurer correctly denied coverage); *Brodkin*, 217 Cal. App. 3d at 218

6    ("Even if there was evidence the claim was improperly handled, there could be no cause of

7    action for breach of the covenant of good faith or of any statutory duty since State Farm

8    correctly denied the claim."); *Kopczynski v. Prudential Ins. Co.*, 164 Cal. App. 3d 846, 849

9    (1985) (holding that where a complaint sought damages against an insurer for bad faith,

10   but the court had upheld the insurance carrier's position, then, "clearly there can have been

11   no 'bad faith' in its denial of liability").

12          Thus, Defendant's Motion for Summary Judgment as to Plaintiff's Second Claim

13   for Relief for Breach of the Implied Covenant of Good Faith and Fair Dealing along with

14   Plaintiff's associated claim for punitive damages is **GRANTED** because Plaintiff has not

15   met his burden of proving Defendant breached its duty of good faith and fair dealing by

16   denying benefits due under the Policy.

17   **V.    CONCLUSION**

18          For the above reasons, the Court **GRANTS** Defendant's Motion for Summary

19   Judgment as follows:

20          1.    The Court finds that the undisputed facts in this case are that (1) the Policy

21   excludes coverage arising while the covered property is undergoing repairs, maintenance,

22   or servicing and (2) Plaintiff's damage arose while the Vessel was undergoing a sea trial,

23   which is part of the repair process.  Even if additional damage resulted because OMC

24   concealed the extent of the damage, no genuine issue of fact exists as to the fact that the

25   original proximate cause of the damage was repairs, and such damage is excluded under

26   the Policy.  Thus, no reasonable jury could conclude Plaintiff was entitled to any benefits

27   under the Policy.

28          2.    The Clerk of the Court will enter judgment in favor of Defendant STATE

FARM FIRE AND CASUALTY, an Illinois corporation, and against Plaintiff RANDOLF CHEREWICK, as to the entire action, which includes Plaintiff's claims for (1) breach of contract and (2) breach of the duty of good faith and fair dealing.  Defendant is the prevailing party.  *See, e.g.*, FED. R. CIV. P. 54(d)(1) (allowing courts to award costs to the prevailing party in a case); *CRST Van Expedited, Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1651 (2016) (holding "that a defendant need not obtain a favorable judgment on the merits in order to be a 'prevailing party'" and "has . . . fulfilled its primary objective whenever the plaintiff's challenge is rebuffed").

     3.     All future dates in this case are vacated, including but not limited to the Final Pretrial Conference.

     **IT IS SO ORDERED.**

DATED:    January 7, 2022

_____

**HON. ROGER T. BENITEZ**
United States District Judge

-53-